Filed 7/7/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CITIZENS FOR A SUSTAINABLE TREASURE ISLAND, <br><br>     Plaintiff and Appellant, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO et al., <br><br>     Defendants and Respondents; <br><br> TREASURE ISLAND COMMUNITY DEVELOPMENT, LLC et al., <br><br>     Real Parties in Interest. | A137828 <br><br> (San Francisco City & County Super. Ct. No. CPF-11-511452) |

**I.**

**INTRODUCTION**

In this petition for writ of mandate, appellant Citizens for a Sustainable Treasure Island (CSTI) contends that respondents City and County of San Francisco (City)[1] and respondent and real party in interest Treasure Island Development Authority (TIDA)[2]

---

[1] Respondents consist of the City and County of San Francisco, San Francisco Board of Supervisors, San Francisco Municipal Transportation Authority, San Francisco Planning Commission, San Francisco Public Utilities Commission, and the Treasure Island Development Authority.

[2] In 1997, the City's Board of Supervisors authorized the creation of TIDA, a nonprofit corporation, to act as a single entity focused on the planning, redevelopment, reconstruction, rehabilitation, reuse and conversion of former Naval Station Treasure Island located on Treasure Island and Yerba Buena Island. For simplicity's sake, we will refer to TIDA as the Project developer. TIDA, together with the City, are the lead agencies responsible for the Project.

failed to certify a legally adequate environmental impact report (EIR) for the Treasure Island/Yerba Buena Island Project (the Project), and therefore violated the California Environmental Quality Act (CEQA) (Pub. Resources Code, §§ 21000 et seq.).[3] The Project, which was unanimously approved by the City's board of supervisors, is a comprehensive plan to redevelop a former naval station located on Treasure Island and Yerba Buena Island in the middle of San Francisco Bay into a new, mixed-use community with updated infrastructure and vastly increased open space and recreational facilities.

CSTI's principal argument is that the EIR should have been prepared as a program EIR, not a project-level EIR, because there is insufficient detail about various aspects of the Project, including remediation of hazardous materials, building and street layout, historical resources and tidal trust resources, for "project-level" review. Furthermore, CSTI claims the project description was not sufficiently accurate and stable to meet CEQA's requirements. CSTI also argues that significant new information developed after the draft EIR was circulated for public review, thereby requiring recirculation of the EIR for additional public comment.

We conclude that CSTI has failed to carry its burden to prove that the EIR was inadequate. (*Barthelemy v. Chino Basin Mun. Water Dist.* (1995) 38 Cal.App.4th 1609, 1617 (*Barthelemy*).) Therefore, we affirm the judgment. This resolution makes it unnecessary to address the cross-appeals, claiming that Treasure Island Homeless Development Initiative, Inc. (TIHDI) is an "indispensable" party to this action.

## II.

### FACTUAL AND PROCEDURAL BACKGROUNDS

The area designated for the Project has an interesting history. Treasure Island is a man-made island consisting of about 404 acres of landfill placed on former tidelands and submerged lands in the middle of San Francisco Bay between San Francisco and Oakland, California. Yerba Buena Island is an adjacent, approximate 160-acre, natural

---

[3] All unspecified section references are to the Public Resources Code.

2

rock outcropping. Treasure Island and the causeway that connects it to Yerba Buena Island were constructed in the late 1930's for the Golden Gate International Exposition. The exposition was held in 1939 to celebrate the completion of the Golden Gate Bridge and the San Francisco/Oakland Bay Bridge.

Shortly thereafter, during World War II, the United States Department of Defense converted the area into a naval station, which it operated for more than five decades. Naval Station Treasure Island consisted of approximately 550 acres, including Yerba Buena Island. Naval Station Treasure Island was subsequently closed in 1993, and ceased operations in 1997.

The existing conditions on the Project site are characterized by aging infrastructure, environmental contamination from former naval operations, deteriorated and vacant buildings, and asphalt and other impervious surfaces which cover approximately 65 percent of the site. The City and the community have been formulating plans for the reuse of former Naval Station Treasure Island, and the adjacent Yerba Buena Island, since its closure.

In June 2011, after more than a decade of planning, study and community input, the City's board of supervisors approved the Project by a vote of 11-0. In approving the Project, the board amended the City's general plan and planning code maps and text, and approved policies and standards for redevelopment of Naval Station Treasure Island.

The Project has been described implicitly as a veritable "Shining City on the Fill." The EIR envisions the Project as including a new, mixed-use community, including up to 8,000 residential units (with at least 25 percent designated as affordable units available at below-market prices); up to 140,000 square feet of new commercial and retail space; up to 100,000 square feet of new office space; restoration and reuse of historic buildings on Treasure Island; about 500 hotel rooms; public utilities; 300 acres of parks, playgrounds, and public open space; bike and transit facilities; and a new ferry terminal and intermodal transit hub. An existing school building would be rehabilitated or rebuilt as a kindergarten through eighth grade public school in coordination with the San Francisco Unified School District. As described by the City's attorney at oral argument, when the

3

Project is implemented, "Treasure Island is going to go from being an underutilized naval station to a whole new state-of-the art section of the City."

Construction and buildout of the Project would be phased, and anticipated to be completed over an approximate 15- to 20-year period.

On July 18, 2011, CSTI filed this petition for writ of mandate challenging the City's decision to certify the EIR for the Project. The hearing on the petition took place over four days. On December 14, 2012, the trial court issued a decision denying the petition in its entirety. Judgment was entered on January 28, 2013. CSTI filed a notice of appeal on February 7, 2013.

TIHDI filed its cross-appeal on February 25. 2013. Treasure Island Community Development (TICD), the master developer selected by TIDA for the Project, filed its cross-appeal on February 27, 2013. The cross-appeals focus on the trial court's decision to deny TIHDI's motion to dismiss CSTI's petition for writ of mandate on the grounds TIHDI was an indispensable party to this action.

## III.

## DISCUSSION

### A. General CEQA Principles and Standard of Review

" 'The EIR is the heart of CEQA' and the integrity of the process is dependent on the adequacy of the EIR. [Citations.]" (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 117.) "The purpose of an [EIR] is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (§ 21061.) "An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . .

4

The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (Guidelines, § 15151.)[4]

We review an agency's determinations and decisions for abuse of discretion. An agency abuses its discretion when it fails to proceed in a manner required by law, or when its determination or decision is not supported by substantial evidence. (§§ 21168, 21168.5; *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426-427 (*Vineyard*).) Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, scrupulously enforcing all legislatively mandated CEQA requirements, we accord greater deference to the agency's substantive factual conclusions. (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 275 (*Santee*).) In CEQA cases, as in other mandamus cases, we independently review the administrative record under the same standard of review that governs the trial court. (*Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1259.)

CSTI claims its "challenge to the EIR's adequacy as an information disclosure document is a procedural claim reviewed de novo by the courts, and thus the question of whether 'substantial evidence' supports the City's determinations is irrelevant." (Italics omitted.) Despite CSTI's strenuous efforts to reframe the issues to allege procedural violations under CEQA, virtually all of the issues it raises on appeal challenge the sufficiency of the information provided to the public and the decision makers.

Because the "fundamental purpose of an EIR is 'to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment,' " absence of information in an EIR may be a failure to proceed in a manner required by law. (*Vineyard*, *supra*, 40 Cal.4th at p. 428, quoting

---

[4] All references to Guidelines are to the CEQA Guidelines (Guidelines) (Cal. Code Regs., tit. 14, § 15000 et seq.). In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous. (*Vineyard*, *supra*, 40 Cal.4th at p. 428, fn. 5; *Santee*, *supra*, 210 Cal.App.4th at p. 276, fn. 10.)

§ 21061.)  But, failing to include information "normally will rise to the level of a failure to proceed in the manner required by law only if the analysis in the EIR is clearly inadequate or unsupported.  [Citation.]"  (*Barthelemy*, *supra*, 38 Cal.App.4th at p. 1620.)

CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive.  (*Barthelemy*, *supra*, 38 Cal.App.4th at p. 1617.)  As was stressed in *Berkeley Keep Jets Over the Bay v. Board of Port Cmrs*. (2001) 91 Cal.App.4th 1344, 1355 (*Berkeley Jets*), the "determination of EIR adequacy is essentially pragmatic."  (*Id.* at p. 1356.)  "Preparing an EIR requires the exercise of judgment, and the court in its review may not substitute its judgment, but instead is limited to ensuring that the decision makers have considered the environmental consequences of their action."  (*Ibid.*)  Hence, an EIR must be upheld if it "reasonably sets forth sufficient information to foster informed public participation and to enable the decision makers to consider the environmental factors necessary to make a reasoned decision."  (*Ibid.*)

Consequently, the "absence of information in an EIR does not per se constitute a prejudicial abuse of discretion.  [Citation.]  Instead, ' "[a] prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process . . . ." [Citation.]'  [Citation.]"  (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 925; *Berkeley Jets*, *supra*, 91 Cal.App.4th at p. 1355; *Barthelemy*, *supra*, 38 Cal.App.4th at p. 1620.)

Under this standard, despite CSTI's arguments to the contrary, "[n]oncompliance with CEQA's information disclosure requirements is not per se reversible . . . ." (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1391.)  A challenger, such as CSTI, asserting inadequacies in an EIR must show the omitted information "is both required by CEQA and necessary to informed discussion. [Citations.]"  (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 986.)

6

### B. *Did the Project Require a Program EIR Instead of a Project EIR?*

CSTI's main argument on appeal is that the City prejudicially abused its discretion by preparing a project EIR instead of a program EIR. Here, the EIR states it is a "project EIR" that analyzes all phases of the Project at maximum buildout. A "project EIR" is prepared for a construction-level project, and "should focus primarily on the changes in the environment that would result from the development project [and] examine all phases of the project including planning, construction, and operation." (Guidelines, § 15161; *In re Bay Delta etc.* (2008) 43 Cal.4th 1143, 1169 (*Bay Delta*).)

In contrast, a "program EIR" evaluates the broad policy direction of a planning document, such as a general plan, but does not examine the potential site-specific impacts of the many individual projects that may be proposed in the future consistent with the plan. (§§ 21068.5, 21093; Guidelines, §§ 15168, 15385.) Program EIRs play a key role in a "tiered" CEQA analysis.[5] (Guidelines, § 15152, subd. (h).)

CSTI argues "at best, the EIR constitutes conceptual, program-level CEQA analysis" which functions as a first-tier document, and anticipates later environmental review on specific projects. CSTI claims the most appropriate way to address the Project is by "tiered environmental review . . . where, as here, the proposal being advanced is an overarching, conceptual plan or program, the project-level details of which will only become known as they are later formulated and presented in a series of later, project-level proposals intended to implement the conceptual plan or program. [Citations.]"

---

[5] " 'Tiering' refers to using the analysis of general matters contained in a broader EIR (such as one prepared for a general plan or policy statement) with later EIRs and negative declarations on narrower projects; incorporating by reference the general discussions from the broader EIR; and concentrating the later EIR or negative declaration solely on the issues specific to the later project." (Guidelines, § 15152, subd. (a); see, e.g., *Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 743 (*Al Larson*) [first-tier EIR adequate when it analyzed goal of increased port capacity while deferring full analysis of anticipated future projects, discussing them only "for the purposes of giving a reasonably detailed consideration to the overall five-year plan"].)

CSTI's contention that the EIR was improperly prepared as a "project EIR" instead of a "program EIR" improperly focuses on the EIR's title rather than its substance. There are many different names that have been applied to EIRs. For example, there are project EIRs (Guidelines, § 15161), program EIRs (Guidelines, § 15168), staged EIRs (Guidelines, § 15167), master EIRs (Guidelines, § 15175), subsequent EIRs (Guidelines, § 15162), focused EIRs (Guidelines, §§ 15178; 15179.5), and supplemental EIRs (Guidelines, § 15163).

For this reason, courts strive to avoid attaching too much significance to titles in ascertaining whether a legally adequate EIR has been prepared for a particular project. As explained in *Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511 (*Friends of Mammoth*): "Designating an EIR as a program EIR . . . does not by itself decrease the level of analysis otherwise required in the EIR. 'All EIR's must cover the same general content. (Guidelines, §§ 15120–15132.) The level of specificity of an EIR is determined by the nature of the project and the "rule of reason" [citation], rather than any semantic label accorded to the EIR.' [Citation.]" (*Id.* at p. 533, quoting *Al Larson*, *supra*, 18 Cal.App.4th at pp. 741-742, fn. omitted.)

As Division Three of this court reiterated, in language particularly pertinent to the issue before us, the "fact that this EIR is labeled a 'project' rather than a 'program' EIR matters little" for purposes of its sufficiency as an informative document. (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 271, fn. 25 (*California Oak*).) " 'The level of specificity of an EIR is determined by the nature of the project and the "rule of reason" [citation], rather than any semantic label accorded to the EIR.' [Citations.]" (*Ibid*.)

Similarly, the court in *Dusek v. Redevelopment Agency* (1985) 173 Cal.App.3d 1029, rejected claims of noncompliance with CEQA as relating "more to labeling and form than . . . to the underlying objectives of CEQA." (*Id.* at p. 1038.) " 'In reviewing an EIR a paramount consideration is the right of the public to be informed in such a way that it can intelligently weigh the environmental consequences of any contemplated action and have an appropriate voice in the formulation of any decision.' " (*Id.* at

8

p. 1039.)  "Our search is for reasonableness, an objective good faith effort to follow the requirements, and substantial compliance with CEQA."  (*Id.* at p. 1040.)

These cases are consistent with the Guidelines, which provide that a lead agency may use EIR variations other than those listed in the Guidelines, so long as they meet "the content requirements discussed in Article 9 beginning with Section 15120." (Guidelines, § 15160.)  Article 9, in turn, requires that EIRs must contain (i) a table of contents or index (Guidelines, § 15122); (ii) a summary (Guidelines, § 15123); (iii) a project description (Guidelines, § 15124); (iv) a discussion of the environmental setting (Guidelines, § 15125); (v) consideration and discussion of environmental impacts (Guidelines, § 15126); (vi) consideration and discussion of significant environmental impacts (Guidelines, § 15126.2); (vii) consideration and discussion of mitigation measures proposed to minimize significant effects (Guidelines, § 15126.4); (viii) consideration and discussion of alternatives to the proposed project (Guidelines, § 15126.6); (ix) a discussion of effects not found to be significant (Guidelines, § 15128); (x) a list of organizations and persons consulted (Guidelines, § 15129); (xi) a discussion of cumulative impacts (Guidelines, § 15130); (xii) to a limited extent, a discussion of economic and social effects of the proposed project (Guidelines, § 15131); and (xiii) revisions to the draft EIR, comments on the draft EIR, a list of commenters on the draft EIR, and the lead agency's responses to comments on the draft EIR (Guidelines, § 15132).  The EIR before us contains all of the required elements of an EIR, and CSTI does not claim otherwise.

CSTI fails to cite any authority supporting its argument that the objective of creating a legally adequate EIR for this Project could only be accomplished by the use of a program EIR.  No such authority exists.  In the end, CSTI improperly tries to convert a discretionary decision that should properly be made by the lead agency into a legal issue that should be resolved by the courts.  (See § 21083.1; *Chaparral Greens v. City of Chula Vista* (1996) 50 Cal.App.4th 1134, 1145 [courts should not interpret CEQA to impose procedural or substantive requirements beyond those explicitly required in the statutes or the Guidelines].)

9

CSTI also repeatedly makes the argument that the EIR was prepared as a project EIR to circumvent the fair argument standard of review that would have been applied to a program EIR for evaluating whether subsequent environmental review is necessary. The fair argument standard creates a low threshold favoring future environmental review and differs markedly from the deferential substantial evidence standard of review normally enjoyed by agencies. (See *Sierra Club v. California Dept. of Forestry & Fire Protection* (2007) 150 Cal.App.4th 370, 381 [distinguishing fair argument standard from usual substantial evidence standard].)

CSTI's argument is based on a flawed legal premise. For purposes of the standard of review, the same substantial evidence standard applies to subsequent environmental review for a project reviewed in a program EIR or a project EIR. (See *Citizens for Responsible Equitable Environmental Development v. City of San Diego Redevelopment Agency* (2005) 134 Cal.App.4th 598, 610 ["Once an agency has prepared [a program] EIR, its decision not to prepare a supplemental or subsequent EIR for a later project is reviewed under the deferential substantial evidence standard" (fn. omitted)]; accord, *Latinos Unidos de Napa v. City of Napa* (2013) 221 Cal.App.4th 192, 201-202 (*Latinos Unidos*) [substantial evidence standard applies in reviewing an agency's determination that a project's potential environmental impacts were adequately analyzed in a prior program EIR]; *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 704 (*Santa Teresa*) [substantial evidence standard applies when agency has already prepared program EIR and the question is whether implementing later phases of the program will result in new impacts].)

Nothing in *Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307 (*Sierra Club*), which is heavily relied upon by CSTI, mandates that the fair argument standard should be unilaterally applied to later projects proposed under a program EIR. That case found the fair argument standard applied when a program EIR had been certified covering mining in connection with the county's resource management plan, and the company was proposing to mine on land that had been designated in the resource management plan as agricultural. (*Id*. at p. 1320.) Because this new project had never

10

previously been assessed and was entirely different from the project that had been considered in the EIR, the court held the fair argument standard applied because, in effect, no prior environmental review had taken place. (*Id*. at pp. 1320-1321.) The court's analysis in *Sierra Club* does not suggest that the fair argument standard automatically applies to subsequent discretionary actions in every case where a program EIR has been prepared. (See *Latinos Unidos*, *supra*, 221 Cal.App.4th at pp. 201-202 [court that decided *Sierra Club* endorses substantial evidence as the normal standard of review].)[6]

It should also be emphasized that in reviewing this EIR, we detect no attempt to avoid supplemental review under section 21166, nor does the designation of this EIR as a project EIR create any shortcut around the environmental review process as it applies to future site-specific approvals. Section 21166 provides: "When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."

---

[6] We recognize that when an agency attempts to tier its environmental review for a materially different project onto a prior program EIR, then the fair argument test is required under section 21094, subdivision (c). (*Sierra Club*, *supra*, 6 Cal.App.4th at p. 1319.) In that situation, the initial study "shall analyze whether the later project *may cause significant effects on the environment* that were not examined in the prior [EIR]." (§ 21094, subd. (c), italics added; see, e.g., *Santa Teresa*, *supra*, 114 Cal.App.4th at p. 704, fn. 11.) The low threshold for requiring preparation of a subsequent or supplemental EIR for a new project that was not addressed in the prior program EIR reflects a preference for resolving doubts in favor of environmental review. (*Sierra Club*, *supra*, 6 Cal.App.4th at pp. 1316-1317.)

The obligation to conduct supplemental review under section 21166 applies regardless of whether the project under consideration has undergone previous, project-specific environmental review, or is being carried out under a plan for which the agency has previously certified a program EIR. (See Guidelines, §§ 15162, 15168, subd. (c)(2); see *May v. City of Milpitas* (2013) 217 Cal.App.4th 1307, 1326 ["Where environmental review has been conducted through a program EIR, CEQA requires further review" in the "limited circumstances" described in section 21166].) Conversely, " '[i]f a program EIR is sufficiently comprehensive, the lead agency may dispense with further environmental review for later activities within the program that are adequately covered in the program EIR. [Citation.]' [Citation.]" (*California Clean Energy Committee v. City of Woodland* (2014) 225 Cal.App.4th 173, 200.) Therefore, CSTI's repeated argument that the lead agency's decision to prepare a project EIR, as opposed to a program EIR, constituted an "unlawful attempt to prospectively evade" the possibility of future CEQA review is baseless. The EIR repeatedly acknowledges the duty to perform supplemental review under section 21166 as the Project builds out over 15 to 20 years, and that duty exists regardless of whether the EIR was prepared as a project EIR, or as a program EIR.

CSTI repeatedly claims that CEQA was violated because "the EIR fails to provide project-level disclosure or analysis." But, the level of detail in an EIR is driven by the nature of the project, not the label attached. "It is the substance, rather than the form, of [the environmental] document which determines its nature and validity. [Citations.]" (*Natural Resources Defense Council, Inc. v. California Coastal Zone Conservation Com.* (1976) 57 Cal.App.3d 76, 91.) As a general statement of CEQA practice, "[t]he degree of specificity required in an EIR will correspond to the degree of specificity involved in the underlying activity which is described in the EIR. . . . An EIR on a construction project will necessarily be more detailed in the specific effects of the project than will be an EIR on the adoption of a local general plan . . . ." (Guidelines, § 15146.) Recently, it was reaffirmed, " 'the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible.' [Citation.]" (*San Diego Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 21, quoting Guidelines, § 15151.)

12

These legal standards, which apply to all EIRs, set the appropriate focus for our review here. Courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure. (Guidelines, § 15151; see *Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 372; *Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 368 (*Rio Vista Farm Bureau*).) Accordingly, the question is not whether a program EIR should have been prepared for this Project, but instead, whether the EIR addressed the environmental impacts of this Project to a "degree of specificity" consistent with the underlying activity being approved through the EIR. (Guidelines, §§ 15146, 15168, subd. (c)(5).) Additionally, in reviewing CSTI's challenge to this EIR, it is unconstructive to ask whether the EIR provided "project-level" as opposed to "program-level" detail and analysis. Instead, we focus on whether the EIR provided "decision makers with sufficient analysis to intelligently consider the environmental consequences of [the] project." (*Bay Delta*, *supra*, 43 Cal.4th at p. 1175.) If these questions are answered affirmatively, the EIR is legally sufficient, regardless of whether it is a project or a program EIR.

### C. Is the Project Description Accurate and Stable?

This court is among the many which have recognized that a project description that gives conflicting signals to decision makers and the public about the nature and scope of the project is fundamentally inadequate and misleading. (*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 84 (*CBE*).) "Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal i.e., the 'no project' alternative), and weigh other alternatives in the balance." (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 192-193 (*County of Inyo*).) Therefore, we have no quarrel with CSTI's citation to case law articulating the general CEQA principle that "[a]n accurate, stable and finite project description is the sine qua non of an informative and legally sufficient EIR." (*Id.* at p. 193, italics omitted.)

In arguing that the EIR's project description is unstable and erratic, CSTI characterizes the project as a 20-year long-range development plan that is nothing more than a "conceptual land use map." Illustrative of these arguments, CSTI asserts "[t]he EIR here . . . analyzes an abstract and indeterminate 'conceptual' development scenario that lacks the 'accurate, finite and stable' project-level details necessary to fully analyze potentially significant impacts." As an example, CSTI claims the specific configuration and design of particular buildings is left for future review. It also contends the Project's street network and layout is only conceptual at this point, with the final layout subject to review by applicable agencies, such as the San Francisco Fire Department.

Contrary to these criticisms, the EIR made an extensive effort to provide meaningful information about the project, while providing for flexibility needed to respond to changing conditions and unforeseen events that could possibly impact the Project's final design. In fact, the design elements CSTI claims are lacking in this EIR are found in several documents that will guide future development. First, the EIR describes the creation of a special use district (SUD), which establishes zoning districts throughout the project area, identifies permitted uses, and provides detailed standards applicable to development within each district.

Implementing the SUD is a document entitled "Treasure Island and Yerba Buena Island Design for Development" (D4D). The D4D contains binding, detailed standards governing virtually every aspect of Project development, including new construction. The D4D includes a plan showing both "fixed" elements, such as street layouts, and "conceptual elements," such as "shapes of new buildings or specific landscape designs."

Taken together, the SUD and D4D provide concrete information regarding building heights, mass, bulk, and design specifications CSTI claims is lacking. The D4D establishes specific "flex zones"—zoning districts in which a limited number of towers (taller buildings) may be located, subject to the maximum height limit in that zoning district. The towers are also subject to quantitative standards dictating separation, bulk, and massing; these standards dictate the buildings' relationship to one another. For analysis purposes, in the section on urban design and visual impacts, representative

14

towers were placed in each tower flex zone at the maximum height proposed. The EIR states that, for purposes of analysis, maximum development is assumed to evaluate the environmental impacts, including impacts of the Project on scenic vistas.[7] As designed, the "zoning rules provide limited flexibility about siting particular buildings, while maintaining tight controls on absolute building heights and development patterns."

The SUD and D4D also include specifications for the street grid, street angles, street widths, block dimensions, setbacks, curb cuts, and a host of other issues, all in great detail. The Project's proposed street network and layout are shown in Figure II.10 of the EIR. The D4D provides additional details in a section entitled "Specific Street Design Layouts."

To be sure, as a matter of necessity at this stage in the planning process, there are many Project features that are subject to future revision, and quite likely will be the subjects of supplemental review before the final Project design is implemented. However, the EIR cannot be faulted for not providing detail that, due to the nature of the Project, simply does not now exist. (Guidelines, § 15146 ["The degree of specificity

---

**7** The EIR analyzes the greatest potential impacts expected to occur to various resources at full buildout. Citing *Environmental Planning & Information Council v. County of El Dorado* (1982) 131 Cal.App.3d 350 (*EPIC*), CSTI challenges this worst-case-scenario methodology. *EPIC* and its progeny hold that in establishing the baseline for assessing environmental impacts, the agency preparing the EIR should compare the existing environment (little or no development) with the total amount of development permitted under the proposed plan. (*Id*. at p. 358; *City of Carmel-by-the-Sea v. Board of Supervisors* (1986)183 Cal.App.3d 229, 246-247; *Christward Ministry v. Superior Court* (1986) 184 Cal.App.3d 180, 186-187.) As our Supreme Court recently emphasized in *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, "[N]othing in CEQA law precludes an agency . . . from considering both types of baseline—existing and future condition—in its primary analysis of the project's significant adverse effects. [Citations.]" (*Id*. at p. 454.) The EIR in this case did that. The Project that is being reviewed is expected to be built over a very long timeframe, during which great change is expected to this largely undeveloped area for which there needs to be a future accounting. The EIR's focus on the maximum impacts expected to occur at full buildout promoted informed decisionmaking, and evidences a good-faith effort at forecasting what is expected to occur if the Project is approved.

15

required in an EIR will correspond to the degree of specificity involved in the underlying activity which is described in the EIR"].) Nor have the courts required resolution of all hypothetical details prior to approval of an EIR, as CSTI implies. (See this division's decision in *Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 909-910 (*Oakland Heritage*) [EIR for mixed-use development sufficiently addressed seismic safety when the "preparers of the EIR" committed themselves to conduct a more thorough "site-specific investigations" that would be used to formulate the final structural designs prior to issuance of all relevant construction permits]; *City of Antioch v. City Council* (1986) 187 Cal.App.3d 1325, 1336-1337 [it was unreasonable and unrealistic to demand that an EIR "must describe in detail each and every conceivable development scenario"].)

CSTI claims that because the EIR does not anticipate every permutation or analyze every possibility, the project description is misleading, inaccurate and vague. However, the legal authority it relies on to support this argument, *County of Inyo*, *supra*, 71 Cal.App.3d 185, did not address a situation where the project description was rendered unstable simply because specific building and design decisions were not made in the EIR. Rather, in *County of Inyo*, the parameters of the proposed project itself were unclear. Initially, that EIR described the project as a 51-cubic-feet-per-second increase in subsurface pumping to supply water used in the Owens Valley. (*Id.* at p. 189.) The EIR, however, went on to analyze a project far greater in scope, including much higher rates of pumping and vast infrastructure needed to deliver water to Los Angeles County. (*Id.* at p. 190.) Thus, the problem with the EIR in *County of Inyo* was that the project description changed throughout the document itself. Many of the environmental impacts described in the EIR were related to the much broader project, rather than the smaller project described at various other points in the EIR. (*Id.* at pp. 190-191; accord, *Western Placer Citizens for an Agriculture & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 898 [the project description should be stable and " '[t]he defined project and not some different project must be the EIR's bona fide subject' "] (*Western Placer*).)

16

Plainly, *County of Inyo* is inapposite. Unlike that case, the basic characteristics of the Project under consideration in this case remained accurate, stable, and finite throughout the EIR process. The EIR in this case contains an 84-page chapter entitled "Project Description." This chapter includes maps showing the project location, the existing character of the site, project features, site plans, project objectives, needed permits, and agencies with jurisdiction—in short, all of the information required by CEQA. CSTI has not argued, nor could it, that the EIR's Project Description was deficient or misleading. Nor does it contend the integral components of the Project, as described in the EIR, have changed in any material way as the EIR went through the environmental review and approval process. Indeed, while repeatedly arguing the Project lacked a stable and finite project description, CSTI fails to refer to the EIR's Project Description at all.

It appears an open question whether the adequacy of a project's description is analyzed as a question of law or an issue of fact. A leading treatise seems to assign it to the latter category. (1 Kostka & Zischke, Practice Under the California Environmental Quality Act (Cont.Ed.Bar 2d ed. Mar. 2014 Update) § 11.39, p. 11-35.) There is no need for this court to decide which standard is correct, because the Project Description here clearly satisfies both standards. Viewed as an informational document, the EIR's Project Description provided sufficient information about the Project to allow the public and reviewing agencies to evaluate and review its environmental impacts, and also provided the required "main features" of the Project. (See *Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 28 (*Dry Creek*).)

### D. Does the EIR Contain an Adequate Discussion About the Presence and Remediation of Hazardous Substances?

CSTI claims "the EIR does not describe, at a project-level degree of detail, the existing location and nature of all hazardous materials [in the Project area] . . . or whether and how the City will remediate such toxic material as part of the Project."

It is well documented that soil, groundwater, and existing structures on Treasure Island are contaminated with hazardous materials. Surveys conducted by the United

17

States Navy (Navy) in 1994 and 2005 revealed soil and groundwater contaminants, such as petroleum, hydrocarbons, volatile organic compounds, semi-volatile organic compounds, poly-aromatic hydrocarbons, dioxins, pesticides, herbicides, PCBs, heavy metals (primarily lead), asbestos, and low-level radiological material.  Buildings are contaminated with lead-based paint and asbestos.  The EIR contains extensive information on the presence and location of these hazardous substances.

It should be stressed at the outset of this discussion that at the time the EIR was being prepared, the cleanup of the site was the sole responsibility of the Navy and was subject to detailed federal, state, and local laws and regulations, including laws that specifically apply to remediation of military bases designated for closure, like Naval Station Treasure Island.  As the EIR explains, the Navy will complete the cleanup of each parcel of land before it is transferred to TIDA, the Project developer.  Prior to transfer, the Navy will issue a "Finding of Suitability to Transfer" (FOST) to document that the Navy has investigated the parcel, that remedial efforts (if needed) have been completed, and that the parcel is ready to be transferred.  The EIR explains:  "These activities are ongoing and will occur with or without the Proposed Project.  These activities are a precursor to future transfer and redevelopment of the area, either as the Proposed Project or for some other use."  The Navy's cleanup activities are discussed in the EIR for informational purposes only.[8]

The Navy has completed its investigation of hazardous substances on the entirety of Treasure Island; and at oral argument held before the trial court on June 15, 2012, it was reported that out of approximately 400 acres, about 170 acres had been cleared by the Navy "and don't contain any contaminants at all, or if they did, it's already been cleaned up."  The Navy is scheduled to continue issuing FOSTs for additional parcels in coming years.

---

[8] In fact, the Navy has taken the position that it is not a "public agency" of the State of California within the meaning of CEQA (see § 21063) and therefore, it is not subject to CEQA's requirements.

18

Therefore, the "operating assumption" is that the Navy will complete the cleanup before the property is conveyed to the City.  Although no early transfer is planned, the EIR acknowledges that under certain circumstances the TIDA or its affiliated agency, TICD, could enter into an agreement with the Navy to assume responsibility for remediation of a particular site.

CSTI cites Site 30 as a "vivid example" of a scenario in which TIDA or TICD would have to engage in cleanup activities.  Site 30 totals 1.5 acres and is a former trash dump laden with hazardous materials, such as dioxins and lead.  In 2003, the Navy capped Site 30 with a concrete pad, measuring approximately 10,000 square feet.  The concrete pad is the foundation of a building that currently serves as a daycare facility. The Navy has decided to leave the building in place because, as it currently exists, it poses no significant risk to human health and the environment.  However, after the Navy transfers this property, it is possible that the building on Site 30 will be demolished along with its concrete pad, thereby disturbing the underlying contaminated soil, in which case TIDA or TICD would have to assume responsibility for investigating, evaluating, and remediating any hazardous substances.

The EIR identified and the City approved, Mitigation Measure M-HZ-1 to address this contingency.  The EIR describes the federal, state, and local laws and regulations governing any cleanup, identifies the agencies (including California's Department of Toxic Substances Control) responsible for oversight, and describes the standards used to conclude that a site does not pose a significant risk to human health or the environment. It is emphasized that in the event TICD or TIDA assumes responsibility for cleanup efforts, it would be subject to the same environmental regulations and regulatory oversight as the Navy.

Despite these provisions, CSTI claims the trial court erred because the EIR "provides no project-level details as to precisely where, when or to what extent [remediation] activities may be required."  Additionally, CSTI argues the "City unlawfully deferred the development and adoption of mitigation measures for significant,

19

adverse impacts resulting from the disturbance of contaminated soil and groundwater . . . ."

In arguing the EIR did not adequately address hazardous substances, CSTI compares this case with *McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136 (*McQueen*), disapproved on other grounds in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 570, footnote 2.  In *McQueen*, the court rejected the contention that the district's acquisition of surplus federal property containing toxic and hazardous substances was entirely exempt from CEQA review.  The purchase of the contaminated land was made in conjunction with the adoption of an interim use and management plan, where the district was "immediately obliged to properly store, use, or dispose of PCB upon acquiring this property . . . ." (*Id.* at p. 1147.)  The *McQueen* court found the district had employed an incomplete and misleading description of its project in determining that it was exempt from CEQA.  The court stated,  "While there is evidence the district gave notice of the proposed property acquisition, there is no evidence that the notice mentioned the acquisition of toxic, hazardous substances." (*Id.* at p. 1150.)  The court required CEQA analysis because it was foreseeable that the district would need to do something—store the toxic materials or dispose of them—once it acquired the land. (*Id*. at p. 1147.)

CSTI claims this case is the same as *McQueen* because "the City violated CEQA by certifying its EIR as constituting project-level review where the EIR fails to disclose and analyze how it would store, manage, and/or dispose of the hazardous materials it would knowingly acquire."  However, unlike the situation profiled in *McQueen,* where environmental review of hazardous substances was avoided entirely, the EIR in this case contains exhaustive information on the presence of hazardous materials on Treasure Island, and the ongoing cleanup efforts conducted by the Navy.

Furthermore, unlike *McQueen*, the approval of the EIR for this Project does not assume TIDA or TICD will undertake any responsibility for the cleanup.  *McQueen* has been distinguished by a number of cases that note that it was the actual environmental effect of foreseeable cleanup activities—not the mere acquisition of contaminated land—

20

that triggered the need for CEQA review. (See, e.g., *Maintain Our Desert Environment v. Town of Apple Valley* (2004) 124 Cal.App.4th 430, 442; *Silveira v. Las Gallinas Valley Sanitation Dist.* (1997) 54 Cal.App.4th 980, 991; *Baird v. County of Contra Costa* (1995) 32 Cal.App.4th 1464, 1468-1469.) This is a distinguishing feature that is present in this case as well. At this point in time, the specific features of any cleanup effort that will have to be undertaken by TIDA or TICD are merely abstract and speculative. Nevertheless, out of an abundance of caution, the EIR sets out mitigation measures that "are a backup, a contingent mitigation in the event that [t]he City assumes control of the cleanup."

Our Supreme Court has clarified that under circumstances similar to those presented here, CEQA analysis is not required, and instead may be postponed to "a later planning stage [for] the evaluation of those project details that are not reasonably foreseeable when the agency first approves the project." (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 139; see Guidelines, § 15145 [EIR need not engage in speculation].) Currently, TIDA or TICD cannot possibly know whether it will be called upon to undertake a more active role in the investigation and cleanup of any portion of the Project site; and where "an EIR cannot provide meaningful information about a speculative future project, deferral of an environmental assessment does not violate CEQA. [Citations.]" (*Rio Vista Farm Bureau*, *supra*, 5 Cal.App.4th at p. 373.)

CSTI also criticizes Mitigation Measure M-HZ-1, which was set out in the EIR in the event TIDA or TICD has to assume control of portions of the cleanup, as containing "only a 'generalized goal' that the developer devise protocols and criteria for managing contaminated soil and water."

In making this argument, CSTI compares this mitigation plan with the mitigation plan we struck down in *CBE*, *supra*, 184 Cal.App.4th 70. In *CBE*, the lead agency approved an EIR for a refinery project that deferred formulation of a mitigation plan for greenhouse gas emissions (to be approved by the City Council) until one year after project approval. (*Id.* at p. 92.) This court found that deferring the formulation of greenhouse gas mitigation measures was improper; particularly where the delay was due

21

to the agency's reluctance to make a finding early in the EIR process that emissions generated by the project would create a significant effect on the environment. Moreover, the mitigation plan "offered no assurance that the plan for how the [p]roject's greenhouse gas emissions would be mitigated to a net-zero standard was both feasible and efficacious, and [it] created no objective criteria for measuring success." (*Id.* at p. 95.)

More recently, in *Oakland Heritage*, *supra*, 195 Cal.App.4th 884 this court upheld deferring site-specific seismic impact mitigation measures when the EIR relied on compliance with "a regulatory scheme designed to ensure seismic safety" that gave "adequate assurance that seismic impacts will be mitigated through engineering methods known to be feasible and effective." (*Id*. at p. 912.) Relying heavily on *Oakland Heritage*, the court in *City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362 (*City of Maywood*), upheld a mitigation plan in which the School District committed itself to perform additional analysis of hazardous waste contamination and to remediate any existing contamination pursuant to state and local statutory and regulatory requirements and under the supervision of the Department of Toxic Substances Control. (*Id.* at p. 412.)

This case has more in common with *Oakland Heritage* and *City of Maywood* than it has with *CBE.* In contrast to the nascent plan for mitigation we examined in *CBE*, the EIR here provides ample information regarding the standards that will be applied, the techniques used, and the oversight provided in the event the City assumes future responsibility for remediation. Specifically, the EIR identifies the standards used by regulatory agencies to determine the efficacy of the cleanup efforts undertaken at each parcel. The EIR also describes the analytical process used to ensure those standards are achieved. Furthermore, the EIR identifies the agencies involved, particularly the Department of Toxic Substances Control and the Regional Water Quality Control Board, and describes their regulatory authority. These regulatory standards and agency oversight apply, regardless of whether the cleanup is performed by the Navy, TIDA or TICD.

The Guidelines specifically recognize that mitigation measures requiring adherence to regulatory requirements or other performance criteria are permitted.

22

(Guidelines, § 15126.4, subd. (a)(1)(B); see *Oakland Heritage*, *supra*, 195 Cal.App.4th at p. 906 ["[A] condition requiring compliance with regulations is a common and reasonable mitigation measure, and may be proper where it is reasonable to expect compliance"].)  The court reviews the adequacy of these measures under the "substantial evidence" standard of review.  (*Id.* at p. 905; *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 625-626 [same].)  CSTI has failed to identify any evidence in the record suggesting that requiring regulatory compliance as mitigation would be infeasible or ineffective.  We thus reject CSTI's challenge to the EIR's mitigation measures.

CSTI next claims "[a]nother example of the lack of project-specific details associated with hazardous materials" is the possibility for a need for a redesign to move development from Site 12 to Site 24.  Section 6.2 of the Disposition and Development Agreement (DDA) describes the understanding of the City, TIDA and TICD regarding the manner in which parcels are expected to become available from the Navy.  Section 6.2.5 of the DDA, entitled "Redesign Trigger Event," addresses the possibility that the transfer of Site 12 may be delayed, or its use restricted, because of the presence of hazardous substances, so as to preclude development of this area.  Section 6.2.5(b) states that if this occurs, TICD has the right to submit applications to shift development from Site 12 to Site 24.

CSTI argues because such a redesign is possible, the EIR should have analyzed it.  Specifically, CSTI complains, the EIR "does not include any such 'redesign' plans—the new design would be left up to the Developer after project approval [citation]—and the EIR does not analyze the impacts of shifting development to this location."

However, at this point, the potential for redesign based on the presence of hazardous substances at Site 12 is entirely speculative.  An EIR is not required to engage in speculative analysis.  (Guidelines, § 15145.)  Indeed, this core principle is well established in the Guidelines and case law.  While a lead agency must use its "best efforts" to evaluate environmental effects, including the use of reasonable forecasting, "foreseeing the unforeseeable" is not required, nor is predicting the unpredictable or

23

quantifying the unquantifiable. (Guidelines, § 15064, subd. (d)(3) ["A change which is speculative or unlikely to occur is not reasonably foreseeable"]; *Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 107-108 [" 'agency is required to forecast only to the extent that an activity could be reasonably expected under the circumstances' "].)

This rule rests on both economic and practical considerations. It has long been recognized that premature attempts to evaluate effects that are uncertain to occur or whose severity cannot reliably be measured is "a needlessly wasteful drain of the public fisc. [Citation.]" (*Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1031; see, e.g., *Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1450-1451 [an EIR for a subdivision of single-family residences was not deficient in failing to consider the possibility that the future lot owners might build a second dwelling on their lot pursuant to a local ordinance allowing such dwellings, because the possibility was remote and speculative].)

It should also be pointed out that Site 12 is designated for residential and open-space uses. Site 24 is zoned as open space. Thus, to accommodate the shift of development from Site 12 to Site 24, the City would have to amend its zoning map for the site. Such a shift, should it occur, would be a discretionary action requiring supplemental environmental review. (§ 21166.) The EIR acknowledges the need for supplemental environmental review in the event such a rezone is proposed. Thus, at this stage, the EIR was not required to analyze the specific impacts of a theoretical shift in development from Site 12 to Site 24.

### E. Should the Draft EIR Have Been Recirculated in Light of New Information?

CSTI next claims the EIR should have been recirculated in light of "significant new information" developed during the public comment period from the United States Coast Guard (Coast Guard) indicating the project may interfere with vessel safety and homeland security on San Francisco Bay.

The Coast Guard's Vessel Traffic Service (VTS) regulates ship traffic on San Francisco Bay and is "an essential component of the Coast Guard's [Maritime Homeland Security] mission." The draft EIR acknowledges the existence of the Coast Guard's VTS

system and states the Project sponsors will enter into an agreement with the Coast Guard with respect to the construction schedule, construction activities, and access to the Coast Guard facility.

In response to its review of the draft EIR, the Coast Guard submitted a letter indicating the VTS system's "line of sight would potentially be broken by several of the buildings proposed in the [Development Plan]." Specifically, the Coast Guard was concerned that any building constructed on Treasure Island exceeding heights of 300 feet could interfere with the VTS system, "creating an unacceptable maritime risk to both the vessels and the public without mitigation." To resolve this issue, the Coast Guard expressed its willingness "to work with the developers to identify appropriate locations on Treasure Island for additional [Coast Guard] facilities to maintain direct radio and radar contact with vessels in the navigable waters of the Bay."

In reply to the letter, the City, TICD and TIDA met privately with the Coast Guard after the draft EIR comment period closed. TICD and TIDA conducted technical studies to determine the minimum building height which could potentially affect VTS equipment operations. These heights are shown in "Heights Requiring Consultation Plan" in the D4D. The final EIR amended the D4D to require consultation with the Coast Guard if future proposals are made for the construction of buildings taller than heights specified in the D4D to determine "whether interference would occur; identify appropriate modifications to any proposed buildings that could cause interference; and require the building developer to make space available and provide access to the Coast Guard to place equipment on the roof of the building . . . or establish some other similar solution, as necessary, for the purpose of maintaining direct radar and radio contact between the VTS and vessels in the navigable waters of San Francisco Bay." A May 25, 2011 letter from the Coast Guard indicated it "reviewed and is comfortable with the proposed consultation process which addressed the concerns raised in our September 3, 2010 letter."

We first address CSTI's argument that private meetings between the Coast Guard and the City, TICD and TIDA somehow subverted CEQA's public disclosure and

25

participation procedures. CEQA allows, if not encourages, public agencies to revise projects in light of new information revealed during the CEQA process. "The CEQA reporting process is not designed to freeze the ultimate proposal in the precise mold of the initial project; indeed, new and unforeseen insights may emerge during investigation, evoking revision of the original proposal. [Citation.]" (*County of Inyo*, *supra*, 71 Cal.App.3d at p. 199; see also *River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154, 168, fn. 11.) One court found the changes made in the project in response to concerns raised in the extended environmental review process showed "CEQA fulfilled its purpose." (*Western Placer*, *supra*, 144 Cal.App.4th at p. 905.) In short, this is the way CEQA is supposed to work—the public comment process may reveal new and unforeseen insights about the project that will affect the final Project design.

CSTI argues these "modifications to the [P]roject" triggered CEQA's mandatory recirculation procedures, so that the interested public could be informed "of such undisclosed, potentially significant adverse impacts on vessel safety and Homeland security impacts on the Bay, and review and respond to them in a renewed public comment period."

When the matter was raised below, the decision not to recirculate the EIR was explained as follows: "Consultation prior to final building design would assure that the Coast Guard operations would not be affected by proposed development on Treasure Island, and therefore no impacts would occur to vessel safety on the Bay." CSTI disagrees with this assessment and claims the information in the final EIR was significant enough to warrant recirculation.

The Guidelines describe the types of "significant new information" requiring recirculation of a draft EIR. These include disclosure of "[a] significant new environmental impact," "[a] substantial increase in the severity of an environmental impact," and the addition of a "feasible project alternative or mitigation measure considerably different from the others previously analyzed." (Guidelines, §§ 15088.5, subd. (a)(1)-(3).) The Guidelines state that "[n]ew information added to an EIR is not

26

'significant' unless the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect . . . ." (Guidelines, § 15088.5, subd. (a).)

The trial court found the Coast Guard's letter raising the VTS issue and the City's response to that letter did not result in "significant new information" within the meaning of CEQA that would require recirculation of the EIR. The trial court held: "[T]he record contains substantial evidence indicating that the Coast Guard's VTS system is compatible with urban development, and that adjustments to that system can be accommodated in a manner that ensures the continued effectiveness of that system, without giving rise to environmental impacts."

In claiming the trial court erred, CSTI contends the City's decision not to recirculate the EIR "involve[s] a procedural violation of CEQA's public participation and informed decisionmaking procedures that is reviewed de novo by the courts." (Italics omitted.) This argument ignores well-established law that courts must defer to an agency's explicit or implicit decision not to recirculate a draft EIR so long as it is supported by substantial evidence. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1135 (*Laurel Heights II*); see also *South County Citizens for Smart Growth v. County of Nevada* (2013) 221 Cal.App.4th 316, 330 (*South County Citizens*) [appellant bears burden of proving decision not to recirculate the final EIR is not supported by substantial evidence]; *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 223.) Indeed, as the court stated in *Western Placer*, *supra*, 144 Cal.App.4th at page 903, an agency's determination not to recirculate is given "substantial deference" and is presumed "to be correct."

CSTI not only ignores the standard of review; it never mentions that, in approving the Project and certifying the EIR, the City explicitly found "[c]onsultation prior to final building design would assure that the Coast Guard operations would not be affected by proposed development on Treasure Island, and therefore *no impacts* would occur to vessel safety on the Bay." (Italics added.) CSTI's burden on appeal is to set forth the

27

evidence supporting this finding, and then to show why it is lacking. (*South County Citizens*, *supra*, 221 Cal.App.4th at p. 330; *Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266; *Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 935; *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 540-541.) CSTI does not even attempt to make an argument that the consultation process incorporated into the final EIR, which would avoid any potential impacts to the VTS system, would be ineffective or would not be carried out as designed. (See *Dry Creek*, *supra*, 70 Cal.App.4th at p. 34 [EIR reasonably assumes integral project features would be implemented].) "This is fatal to its claim." (*South County Citizens*, *supra*, 221 Cal.App.4th at p. 331.)

When all of these circumstances are considered, CSTI has failed to show that meaningful public comment was thwarted. In *Laurel Heights II*, the court considered whether several categories of new information added to the final EIR constituted "significant new information" triggering recirculation. (*Laurel Heights II*, *supra*, 6 Cal.4th at p. 1136.) The draft EIR in *Laurel Heights II* did not discuss the potential visual effects of the light glare from the project, but in response to public comments, the final EIR included a discussion of the impact, concluded it was less than significant, but nonetheless imposed a mitigation measure. (*Id*. at p. 1140.) The court found that the impact from the light was insignificant and thus did not trigger a requirement that the EIR be recirculated. (*Id*. at pp. 1140-1141.)

Like the light glare in *Laurel Heights II*, the new information about the Project's potential impacts on the Coast Guard's VTS system, and the modification of the D4D to add a consultation requirement, did not show any new significant adverse impacts.[9]

---

[9] CSTI surmises that "mitigation measures calling for the relocation of [Coast Guard's] VTS to the top of private, high-rise residential towers in the middle of San Francisco Bay may, themselves, have significant adverse effects triggering a <u>mandatory</u> finding of significance under CEQA." (Original underscoring, fn. omitted.) There is no evidence supporting this conjecture. (*Pala Band of Mission Indians v. County of San Diego* (1998) 68 Cal.App.4th 556, 577 [speculative possibilities are not substantial evidence of environmental impact].)

28

Here, the refinements that occurred in the EIR at the Coast Guard's behest do not constitute the type of significant new information requiring recirculation. (See, e.g., *California Oak*, *supra*, 188 Cal.App.4th at pp. 266-268 [seismic studies and requests for further investigation by regulators did not trigger duty to recirculate draft EIR absent evidence of new seismic risks]; *Western Placer*, *supra*, 144 Cal.App.4th at pp. 904-905 [no recirculation required despite changes in project phasing in response to concerns expressed after draft EIR was circulated].)

### F. Does the EIR Adequately Discuss Preservation of Historic Resources?

CSTI next claims the EIR "failed to analyze or mitigate impacts to historic resources at a project-level of detail, because it does not disclose or analyze the prospective end reuses of Buildings 1 and 3, which all parties agree are qualifying historic resources . . . ."

Historic resources are accorded special protection under CEQA, and the state must "take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state" including the protection and rehabilitation of "objects of historic or aesthetic significance." (§§ 21001, subd. (a), 21060.5.) " ' "Historical resource" includes, but is not limited to, any object, building, structure, site, area, [or] place . . . which is historically or archaeologically significant, or is significant in the architectural, engineering, scientific, economic, agricultural, educational, social, political, military, or cultural annals of California.' " (§ 5020.1, subd. (j); see *Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 186.)

Buildings 1 and 3 were constructed in an Art Moderne style as permanent structures for an international exhibition celebrating the construction of the Golden Gate and Bay Bridges. They have historical significance and will be retained. However, at the time the EIR was prepared, specific uses for these buildings had not been identified, although it was envisioned "the large, open exposition/hangar spaces within [these buildings] would flexibly accommodate a wide variety of potential uses" with minimal changes to the buildings' distinctive features. Once specific architectural design proposals are selected, the D4D requires that Buildings 1 and 3 be rehabilitated in

29

accordance with the United States Secretary of the Interior's Standards for the Rehabilitation and Guidelines for Rehabilitating Historic Buildings (Secretary's Standards).

The Secretary's Standards are the benchmark that CEQA uses to establish whether a project will have a significant adverse impact to a historic property. Guidelines section 15064.5, subdivision (b)(3) reads as follows: "Generally, a project that follows the [Secretary's Standards] shall be considered as mitigated to a level of less than a significant impact on the historical resource."

CSTI claims that because there is no documentation showing actual proposed architectural designs for Buildings 1 and 3, the EIR failed "to analyze or mitigate impacts to historic resources at a project-level of detail." However, as we have emphasized, the Guidelines provide that if the Secretary's Standards are adhered to, any impact to these historical structures that might otherwise be regarded as adverse will be considered to have been mitigated to insignificant levels. The EIR clearly prohibits making any physical alterations to Buildings 1 and 3 that do not comply with the Secretary's Standards. It is difficult to imagine any more specific criteria protecting the architectural integrity of these structures.

Although CSTI claims there are proposals for the reuse of these building that could potentially violate the Secretary's Standards, it does not cite evidence supporting this claim. This court can assume that the Project will be built as proposed, and that any adaptive reuses for Buildings 1 and 3 will retain their historic features in accordance with the Secretary's Standards. (*Dry Creek*, *supra*, 70 Cal.App.4th at pp. 33-34 [EIR could assume project features would function as designed].)

In this regard, we note that a public comment was submitted asking what would happen if a reuse was proposed for one of the historic buildings that was inconsistent with the Secretary's Standards. The City responded that "a future project that does not conform to the Secretary's Standards is not covered in the EIR and therefore would require additional environmental review under CEQA." Consequently, the door is left open for future, supplemental environmental review if the final project design does not

30

meet the Secretary's Standards, potentially creating a significant adverse impact on a historic resource. CEQA requires nothing more. (See *Towards Responsibility in Planning v. City Council* (1988) 200 Cal.App.3d 671, 681 ["It would be unreasonable to expect this EIR to produce detailed information about the environmental impacts of a future [building] whose scope is uncertain and which will in any case be subject to its own environmental review"].)

### G. Does the EIR Assure Consistency with the Tidelands Trust?

It is well settled that tidelands remain subject to a reserved easement in the State for common law public trust purposes. (See generally *Marks v. Whitney* (1971) 6 Cal.3d 251, 259-261.) Under the common law public trust doctrine, the state has title as trustee to all tidelands and is charged with " 'the preservation of those lands in their natural state, so that they may serve as ecological units for scientific study, as open space, and as environments which provide food and habitat for birds and marine life, and which favorably affect the scenery and climate of the area.' [Citation.]" (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 434-435.) There is also a statutory trust imposed by the Treasure Island Conversion Act of 1997 (1997 Conversion Act). (Health & Saf. Code, § 33492.5, Stats. 1997, ch. 898, § 12, p. 6456, as amended by Stats. 2011, ch. 429, § 2, pp. 4511-4512.) Both the trust doctrine and the 1997 Conversion Act are referred to collectively as the Tidelands Trust (Trust). The Trust generally prohibits residential, general office, non-maritime industrial, and certain recreational uses on lands that are subject to the Trust.

CSTI claims the EIR "failed to disclose and analyze the impacts of proposed non-trust uses on portions of T[reasure] I[sland]" that are subject to the Trust. To the extent CSTI frames its argument to imply that non-trust uses would be permitted on lands restricted by the Trust, CSTI is wrong.

As the EIR explains, there will be no inconsistencies between the Project and the Trust because the project is legally required to conform to the Trust. The EIR acknowledges "[a]ny portion of the Project Area that consists of tidelands and submerged lands, or former tidelands and submerged lands that have been filled, will become subject

to the use restrictions imposed under the Tidelands Trust upon conveyance from the Navy to TIDA." TIDA, the trustee of Trust properties in the Project area, "has a statutory duty to ensure that uses on Public Trust property are consistent with the Public Trust" and "may not approve any use that it finds to be inconsistent with the trust or otherwise not allowed under the Conversion Act."

To ensure consistency, the D4D establishes a Tidelands Trust Overlay Zone governing all property subject to the Public Trust. TIDA must review all uses proposed within the overlay zone for consistency with the Trust. It was also envisioned, "as a matter of practice, TIDA and the State Lands Commission will continue to cooperate throughout planning, design, and buildout of the Proposed Project." The EIR's conclusion that the uses of areas subject to the Trust will not impact Trust values is therefore supported by evidence in the record, and CSTI has not pointed to evidence indicating otherwise.

CSTI's argument appears to be that because certain proposed uses are not yet known to be consistent with the Trust, the project description is not sufficiently "accurate, finite and stable" to understand the Project's impacts. CSTI identifies some of the many uses proposed for the property subject to the Trust, i.e, "solar panels, dog parks, and permanent recreation fields . . . ." In response to public comments, the final EIR addresses whether these uses would be considered permissible public trust uses. "[U]ses such as commercial, open space, recreational or energy uses may be found to be consistent depending on the extent to which such uses further Public Trust purposes." (Underscoring added.) However, "[b]ecause each use on Public Trust property must be evaluated in light of all of the surrounding circumstances, it is premature to conclude whether a particular energy, commercial, open space and recreation, or cultural/institutional use . . . would be consistent with the Public Trust."

There is nothing in this record to indicate that the Project would fail to achieve the required consistency with the Trust. The EIR's analysis, summarized above, complied with the Guidelines, as it included "a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which

32

intelligently takes account of environmental consequences." (Guidelines, § 15151.) Nothing more was required. (See *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 373 [CEQA does not require lead agencies "to engage in speculation in order to analyze a 'worst case scenario' "].)

### H. The Cross-Appeals

As TICD and TIHDI set out in the preambles to their cross-appeals, it is *only if* we reverse the trial court's decision denying CSTI's petition for writ of mandate that we need concern ourselves with their cross-appeals. Having determined that the trial court's denial of CSTI's petition for writ of mandate should be affirmed, we need not, and do not, reach the issues presented in the cross-appeals.

## IV.

## DISPOSITION

The judgment denying the petition for writ of mandate is affirmed. In light of this conclusion, we need not, and therefore do not address the issues raised in the cross-appeals. Costs on appeal are awarded to respondents.

_____
RUVOLO, P. J.

We concur:

_____
REARDON, J.

_____
RIVERA, J.

| | |
|---|---|
| Trial Court: | San Francisco Superior Court |
| Trial Judge: | Hon. Teri L. Jackson |
| Counsel for Appellant<br>Citizens for a Sustainable<br>Treasure Island | Lippe Gaffney Wagner, LLP<br>Keith G. Wagner, Brian Gaffney,<br>Thomas N. Lippe, Kelly A. Franger |
| Counsel for Respondents<br>City and County of San Francisco,<br>San Francisco Board of Supervisors,<br>San Francisco Municipal Transportation<br>Authority, San Francisco Planning<br>Commission, San Francisco Public<br>Utilities Commission, and Treasure Island<br>Development Authority [TIDA is also a<br>Real Party in Interest] | Dennis J. Herrera<br>San Francisco City Attorney<br>Andrea Ruiz-Esquide<br>Deputy City Attorney |
| Counsel for Real Party in Interest and<br>Cross-Appellant Treasure Island<br>Homeless Development Initiative, Inc. | Cox, Castle & Nicholson<br>Michael H. Zischke<br>Andrew B. Sabey |
| Counsel for Real Party in Interest and<br>Cross-Appellant Treasure Island<br>Community Development, LLC | Remy Moose Manley<br>Whitman F. Manley<br>Howard F. Wilkins III<br><br>Gibson, Dunn & Crutcher<br>Mary G. Murphy<br>Neil H. Sekhri |

1