Filed 4/11/22 (unmodified opinion and 3/22/22 pub. & mod. order attached)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| BUENA VISTA WATER STORAGE DISTRICT,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>KERN WATER BANK AUTHORITY,<br><br>　　Defendant and Appellant. | 2d Civil No. B309764<br>(Super. Ct. No. 56-2019-00528316-CU-WM-VTA)<br>(Ventura County)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on February 23, 2022, be modified as follows:

On page 1, the second sentence of the first paragraph beginning "In 2010, the State Water Board" is deleted and replaced with:

> In 2010, the State Water Board (State Board) issued an order removing the fully appropriated stream designation of the Kern River based on evidence that "there [was] some

unappropriated water in the Kern River" in certain wet years.

There is no change in judgment.

Respondent's petition for rehearing is denied.

_____
YEGAN, Acting P. J.     PERREN, J.     TANGEMAN, J.

Filed 2/23/22; modified and certified for publication 3/22/22 (order attached) (unmodified opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| BUENA VISTA WATER STORAGE DISTRICT, Plaintiff and Respondent, v. KERN WATER BANK AUTHORITY, Defendant and Appellant. | 2d Civil No. B309764 (Super. Ct. No. 56-2019-00528316-CU-WM-VTA) (Ventura County) |

Appellant Kern Water Bank Authority (KWBA) appeals from the judgment granting respondent Buena Vista Water Storage District's (Buena Vista) petition for a writ of mandate. KWBA contends the trial court erred in finding its environmental impact report (EIR) inadequate pursuant to the California Environmental Quality Act (CEQA). We agree the EIR was adequate and reverse.

## FACTUAL AND PROCEDURAL HISTORY

KWBA is a "Joint Powers Authority," a public agency consisting of five water districts and one privately-owned mutual water company. KWBA operates Kern Water Bank (KWB). Surface water from various sources, including the Kern River, is diverted into land owned by the KWBA to recharge the KWB. In dry years, KWBA recovers water from the KWB. Buena Vista is a water storage district located within Kern County.

### Kern River Hydrology

The Kern River originates in the southern Sierra Nevada and flows southwest to the floor of the San Joaquin Valley. The upper segment of the river flows into the Lake Isabella Reservoir and Dam, which has been used as a storage and regulation reservoir by the United States Army Corps of Engineers (USACE) and Kern River rights holders. The Kern River Watermaster manages water stored within Isabella Reservoir and directs releases from it for water control purposes or to satisfy the needs of Kern River water rights holders.

Below the Isabella Dam, river flows are controlled by a series of weirs and canals used to divert water. Some of the key features in the lower segment of the river include the First Point of Measurement (located 30 miles downstream from Lake Isabella), the Second Point of Measurement (located several miles downstream from the First Point), and the Kern River-California Aqueduct Intertie (Intertie). The First Point of Measurement was established to measure river flow prior to major diversions so the flows could be properly apportioned among rights holders. The Second Point of Measurement was established to document deliveries to downstream rights holders. The Intertie is a

2

physical structure through which flood waters are diverted to the California Aqueduct.

Under normal conditions, the Kern River is dry as it runs through Bakersfield. But in some wet years, the river flows through Bakersfield before reaching the Intertie. In these wet years, water flows reach a level that trigger "mandatory release" flood conditions. These are conditions under which USACE orders the release of water (flood flows) from the Isabella Reservoir. To alleviate downstream flooding, the Department of Water Resources (DWR) operates the Intertie to catch excess flood flows and divert them into the California Aqueduct.

*Existing Kern River Water Rights*

California law recognizes "appropriative water rights." These rights allow the rights holder to divert a specified quantity of surface water for a reasonable, beneficial use on land. Before 1914, Kern River water rights were administered through "'the law of the river,'" arising from a series of court decisions, orders, decrees, and agreements dating back to the 1860s.

In 1914, the Water Commission Act went into effect. Thereafter, only the State Water Board (State Board) may issue new appropriative water rights. (Wat. Code,[1] § 1225.) To date, most Kern River water diversions are based on pre-1914 water rights. A definitive quantification of all water rights on the Kern River has never been conducted.

Pre-1914 water appropriative rights have sequential priority. When river flow is insufficient to supply all rights holders, the highest priority appropriator is entitled to full appropriation before the next is entitled to any. Pre-1914 rights

---

[1] Further unspecified statutory references are to the Water Code.

holders have priority over any appropriative rights granted by the State Board.

Under the 1888 Miller-Haggin Agreement,[2] water rights were allocated into three groups: First Point rights, Second Point rights, and Lower River rights. Water allocations are based on the computed natural flow at the First Point, and allocations of the First and Second Point flows are made on a daily basis. Any water that is not stored or diverted by the First and Second Point rights holders and which passes State Highway 46 via the Kern Flood Channel belongs to Lower River rights holders. Allocations to Lower River rights holders are typically only available in wet years.

The City of Bakersfield, North Kern, and Kern Delta Water District hold the First Point rights. Respondent Buena Vista holds the Second Point rights. The Kern County Water Agency holds the Lower River rights.

*KWBA Water Source*

KWBA does not hold Kern River water rights except for those rights it has purchased from others. Water diverted into the KWB is obtained from three main sources: the State Water Project, the Central Valley Project, and the Kern River. Kern River water (from both purchases and floodwater) accounts for about 24 percent of the water diverted to the KWB.

KWBA has diverted and used Kern River water in accordance with the "Policy Re-Utilization of Isabella Reservoir Flood Releases" (Flood Policy).[3] This policy is implemented by

---

[2] The Miller-Haggin Agreement was a settlement among certain Kern River diverters.

[3] The Flood Policy has been in effect at least since 1986.

4

the Kern River Watermaster pursuant to an agreement among Kern River rights holders.  The Flood Policy takes effect in wet years when mandatory release conditions are triggered and flood flows released from the Isabella Reservoir flow into the Intertie. The Flood Policy provides that during periods when (1) abnormal flow is released from the Lake Isabella Reservoir by order of USACE and (2) such flow enters into the Intertie, water is available to "any person, interest or group in Kern County who wish to divert that water, up to the amount of water flowing into the Intertie, provided such interest, person or group acknowledges their desire to divert said water by executing an 'Order' which shall include, among other things, a description of the point they wish to divert such flow, the rate of flow they wish to divert and provide a schedule such that the request may be honored by the operating Kern River entity.  The policy is without prejudice to the rights of any of the Parties."

*State Board and Court Decisions*

In 1964, the State Board issued Water Right Decision 1196 (D-1196), in which it found no Kern River water available for appropriation.  Based on this decision, the State Board included Kern River on its list of Fully Appropriated Streams (FAS Declaration) pursuant to sections 1205 through 1207.  The State Board subsequently issued an order (WR 89-25) adopting the FAS Declaration.  The finding that Kern River was fully appropriated was reconfirmed in 1991, 1994, and 1998 (WR 91-07, WR 94-01 and WR 98-08).

The FAS Declaration may be modified based on a "change in circumstances."  (Cal. Code Regs., tit. 23, § 871, subd. (b).)  Circumstances began changing with the construction of the Intertie in 1977.  The Intertie was built to alleviate flooding in

5

the lower Kern River region and nearby agricultural lands in wet years.  The Intertie only diverts river flows to the aqueduct when flows are in excess of water claimed by the water rights holders.  Since the construction of the Intertie, floodwater has been diverted from the Kern River in nine separate years.

In 2007, the Fifth District Court of Appeal decided *North Kern Water Storage Dist. v. Kern Delta Water Dist.* (2007) 147 Cal.App.4th 555 (*North Kern Water Storage*)—a case litigated amongst First Point rights holders.  The court held that there was a partial forfeiture of Kern Delta's First Point rights due to nonuse.  (§ 1241.)  The court concluded that the question of whether the forfeiture created available water for appropriation would be resolved by the State Board.  (*North Kern Water Storage*, at p. 584.)

The State Board received petitions requesting revisions to the FAS Declaration.  The State Board found, based on (1) the occasions in which the Intertie diverted excess floodwater and (2) the partial forfeiture finding in the *North Kern Water Storage* case, that there "may have been a change in circumstances."  The State Board set a hearing on the question of whether the FAS Declaration should be revised.

Following a hearing, the State Board issued an order (WR 2010-0010) amending the FAS Declaration to remove the designation of the Kern River as fully appropriated.  The State Board concluded that "there [was] some unappropriated water" based on evidence that water in excess of that claimed by rights holders had been diverted into the Intertie in certain wet years.

The State Board ordered the FAS Declaration amended "to allow for processing applications to appropriate water from the Kern River."  The State Board clarified that the

6

"processing water right applications will require consideration of numerous issues not addressed in this order," including "when and how much available water there is for appropriation."

Buena Vista and KWBA, among others, petitioned for reconsideration of the order amending the FAS Declaration. Their petitions were denied in order WR 2010-0016. The State Board clarified that its order amended the FAS declaration based on evidence that there was some unappropriated water available, but concluded that "issues concerning the specific amounts of water available for appropriation, the season of water availability, and other issues relevant to determining whether water rights permits may be issued are best determined as a part of the processing of water rights applications."

*The Project*

The Kern Water Bank Authority Conservation and Storage Project (the Project) was proposed by KWBA and is designed "to directly divert up to 500,000 [acre-feet-per-year (AFY)] from the Kern River for recharge, storage, and later recovery within the KWB through existing diversion works and recharge facilities located on the KWB lands, and/or to deliver water directly to KWBA's participating members' service areas via [existing canals]."[4] KWBA, as the lead agency, prepared an EIR to evaluate environmental impacts of the Project. The EIR was also intended to be used by the responsible agency (i.e., the

---

[4] 500,000 AFY is the maximum quantity that KWBA can physically divert and recharge within the KWB in the wettest years. Any water directly diverted to KWBA members would reduce the amount that can be diverted to storage by the same amount.

State Board) to consider "how or whether to approve permits associated with implementation of the project."

The EIR "addresses the appropriation of high flow Kern River water, only available under certain hydrologic conditions and after the rights of senior Kern River water right holders have been met, that otherwise would have:  (1) been diverted to the Intertie, (2) flooded farmlands, or (3) left Kern County."  The EIR further stated that based on an analysis of historical hydrology, flood flows would be available for diversion in only about 18 percent of all years.

The EIR specified in the "Project Objectives" that KWBA seeks to "[s]ecure water rights to unappropriated Kern River water in order to maximize use of the KWB's existing capabilities," "[c]ontinue [allowing] Kern River water to be diverted to the KWB during times of excess Kern River flows for recharge and later recovery by KWBA," and enhance "water supply reliability, particularly in dry years, to KWBA participating members through storage within the KWB."

To fulfill Project objectives, KWBA separately filed an application with the State Board (Application 31676), seeking a water right permit to directly divert up to 500,000 AFY of water from Kern River for underground storage and other beneficial uses *during years when water is available*.  The EIR analyzed the impacts of State Board approval of this permit.

The EIR evaluated various environmental impacts, including the impacts on hydrology and groundwater resources. It used the environment settings from 1995 (when KWB began operating) to February 2012 (when the Notice of Preparation for the Project was issued) as the baseline conditions.  The EIR

discussed the hydrological changes that would occur if the Project was implemented.

KWBA conducted a Water Availability Analysis (WAA)[5] with a "key objective" "to determine if flood water is available for appropriation." The WAA provided historical measurements of diversions of Kern River water by existing rights holders. It also provided measurements of Kern River water diverted to the Intertie, and the amount diverted by KWBA in prior years pursuant to the Flood Policy (KWBA diverted flood flows in three years during the baseline period). From these records, the WAA estimated how much water, in excess of that used by rights holders, could have been delivered to the KWB based on existing water banking recharge and diversion capacities. Based on the analysis, the EIR found "there exists both the opportunity to fulfill the water requested by the project as well as the quantity of surplus water being requested by the project on these occasions."

The EIR concluded that because "KWBA would only divert available surplus Kern River water which cannot otherwise be used or stored by existing Kern River water right holders, and would not divert surplus flows in normal or dry years, . . . [n]o mitigation is required because the project is not expected to result in a significant impact on available water supply."

The EIR also discussed the Project's impact on groundwater resources. It determined that there would be a "less than significant" impact on groundwater levels, because the

_____

[5] The entire WAA is included in the appendix to the EIR. Relevant summaries and findings from the WAA are presented in the EIR.

9

Project seeks to "only . . . increase water available for recharge and storage" and not to change recovery operations (within historical levels) in multiple dry years. Thus, "recovery operations would not result in any marginal lowering of groundwater levels." The EIR concluded that "[n]o mitigation is required because the project is not expected to result in significant impacts on groundwater recharge or local groundwater elevations." Following a comment period, KWBA certified the final EIR and approved the Project.

*Trial Court Proceedings*

Buena Vista petitioned for a writ of mandate, seeking to set aside KWBA's certification of the EIR and its approval of the Project.

The trial court granted the writ on the ground that the EIR was "inadequate." The court found: (1) the "definitions of Project water and existing water rights are inadequate because they are inaccurate, unstable, and indefinite"; (2) the "baseline analysis is inadequate because it fails to include a full and complete analysis, including quantification, of competing existing rights to Kern River water"; and (3) the "analysis of environmental impacts is inadequate in terms of the significant environmental impacts on senior rights holders and significant environmental impacts on groundwater during long-term recovery operations." The court ordered KWBA to set aside the resolution certifying the EIR, prepare a legally adequate EIR, and suspend activities related to its approval of the Project.

**DISCUSSION**

KWBA contends (1) the Project descriptions of Project water and existing water rights satisfied CEQA requirements; (2) a complete quantification of existing Kern River water rights was

10

not required; and (3) the EIR properly evaluated the environmental impacts of long-term recovery operations on existing rights and groundwater levels.  We agree with each of these contentions.

*General CEQA Principles and Standard of Review*

The EIR is the "'heart of CEQA.'"  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 (*Laurel Heights*).)  The purpose of an EIR is "to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project."  (Pub. Resources Code, § 21061.)  "Informed public participation is essential to environmental review under CEQA."  (*Washoe Meadows Community v. Department of Parks & Recreation* (2017) 17 Cal.App.5th 277, 285.)

"An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences.  An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . .  The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure."  (Cal. Code Regs., tit. 14, § 15151.)

We review the agency's action rather than the trial court's ruling, applying the same standards as the trial court; in that sense appellate judicial review under CEQA is de novo.

11

(*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.)

We review the agency's decision for abuse of discretion. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 392; Pub. Resources Code, § 21168.5.) Abuse of discretion is established (1) when the agency has not proceeded in a manner required by law or (2) if the determination or decision is not supported by substantial evidence. (*Laurel Heights*, at p. 392.) "'Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable."' (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512 (*Sierra Club*).)

*Project Description*

KWBA correctly contends the trial court erred when it found that the descriptions of (1) Project water and (2) existing water rights were inaccurate, unstable, and indefinite.

"[E]very EIR must set forth a project description that is sufficient to allow an adequate evaluation and review of the environmental impact." (*San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 654.) An "accurate, stable[,] and finite" project description is essential to an informative and legally sufficient EIR. (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 193 (*County of Inyo*).) "A curtailed or distorted project description may stultify the objectives of the reporting process. Only through an accurate

12

view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance." (*Id*. at pp. 192-193.) An agency's failure to provide an accurate, stable, and finite project description is a failure to proceed in a manner required by law. (*Id*. at p. 200.)

### 1. Project Water

Here, the "Project Description" chapter adequately and consistently describes Project water as "high flow Kern River water, only available under certain hydrologic conditions and after the rights of senior Kern River water right holders have been met, that otherwise would have (1) been diverted to the Intertie, (2) flooded farmlands, or (3) left Kern County."

In the same chapter and in other chapters, the EIR describes the "hydrologic conditions" in which Project water would be available and defines the terms "diverted to the Intertie," "flooded farmlands," and "left Kern County." In the chapter describing the Project's environmental settings, the EIR explains that before the Intertie was built, "high flows would spill into agricultural fields in the Buena Vista Lake and Tulare Lake beds." After the Intertie was built, these high flows (that would have otherwise flooded agricultural fields) are now diverted through the Intertie into the California Aqueduct, where the water is then routed out of Kern County. Even after construction of the Intertie, there have been instances where up to 430,000 AF of water bypassed the Intertie to "flood farmlands in the Tulare Lake Basin, where a large volume of that water simply evaporated."

13

The EIR explains that the Intertie is used when mandatory release conditions result in the release of flood flows from the Lake Isabella Reservoir. The EIR estimates that Project water would be available in 18 percent of all years, based on historical records, which show that the Intertie has operated nine years since it was built.

Buena Vista contends that the description of Project water is inconsistent throughout the EIR and highlights four other descriptions: (1) "water that would 'trigger mandatory release conditions for flood control, cause downstream flooding, and/or operate the intertie'" or "'flood flows'" resulting from the Flood Policy; (2) "water that was historically offered to the Intertie"; (3) "water historically diverted by KWBA"; and (4) "'unappropriated'" or "'surplus'" water. This contention fails because these descriptions are not inconsistent; but instead, they describe in different words the same conditions under which Project water has historically flowed.

First, "mandatory release flood flows" is not an inconsistent description because, as the EIR explains, Project water is available in years when mandatory release conditions are triggered—that is, when abnormally heavy flow is released from the Isabella Reservoir and the Intertie is operated to catch flows that would otherwise cause flooding to farmlands.

Buena Vista contends that the term "flood flows" is unclear because water diverted to Lower River rights holders is also referred to as flood flows. But the EIR clarified that "flood flows" refer to water released from the Lake Isabella Reservoir. The EIR also emphasizes that Project water is unappropriated water that is available only after existing water rights are satisfied, whereas water subject to Lower River rights is

14

appropriated water that does not meet the EIR's description of Project water.

Second, "water . . . historically offered to the Intertie" is not an inconsistent description of Project water. The Project seeks diversions of water that "have historically occurred and are proposed to occur only in high water years when [the DWR] might otherwise operate the Intertie to capture excess flood flows." Thus, water diverted through the Intertie into the California Aqueduct is unappropriated water.

Third, water that "KWBA has historically received" is not an inconsistent description of Project water. The EIR explains that pursuant to the Flood Policy, KWBA has historically diverted flood flows into the KWB that would have otherwise been diverted to the Intertie. Thus, the Project would "result in a State Water Board permit for the continuance of a pre-existing activity through use of existing facilities." The EIR further clarifies that the Project would seek a permit "for an existing source of water" "only to the extent unappropriated Kern River flows" are available. This amount of water "'would not necessarily represent an increase in annual diversions relative to diversions that have historically occurred in the project area.'" In essence, the Project seeks to establish a right to the same water that KWBA has historically diverted under the Flood Policy.

Buena Vista contends that it is unclear if the Project water is limited to floodwater that KWBA historically diverted to the KWB (a maximum of 80,735 AFY of floodwater) or if KWBA's historical purchases of Kern River water (a maximum of 155,948 AFY) are included. But purchased water is water that had first been diverted pursuant to existing water rights. Thus, purchased

15

water is not unappropriated water.  As such, it does not meet the description of Project water.

Buena Vista also contends that the Project description is unstable and indefinite because it "relies on the open-ended limit of 'up to 500,000 AF of Kern River water.'" Buena Vista compares this case to *Stopthemillenniumhollywood.com v. City of Los Angeles* (2019) 39 Cal.App.5th 1, in which the EIR's project description was "indefinite."  That case is distinguishable.  There, the project was for a "mixed-use development" and the description "fail[ed] to describe the siting, size, mass, or appearance of any building proposed to be built at the project site."  (*Id*. at p. 18.)  The draft EIR merely presented different conceptual scenarios that future developers could follow for the development of the site.  Such "concepts and development scenarios—none of which may ultimately be constructed," did not meet the requirement of a stable or finite proposed project.  (*Ibid*.)

Here, a precise amount of water for the Project cannot be determined because water availability will fluctuate from year to year.  Nonetheless, the Project proposes a finite maximum amount of water for diversion and provides estimates of the amount of water that could have been diverted based on historical hydrological conditions.  A project description may use a flexible parameter when the project is subject to future changing conditions.  (See *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1172-1173; see also *Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1053-1054 (*Treasure Island*).)  Thus, the EIR provides an accurate, stable, and finite Project description. (*County of Inyo, supra*, 71 Cal.App.3d at p. 193.)

16

## 2. Existing Water Rights

The trial court determined that the Project Description was inadequate because it did not "actually quantify the amount that water right holders . . . are entitled to" and that this "incomplete data suggests that KWBA failed to investigate and disclose all that it reasonably could." KWBA argues that the Project description need not include the complete quantification of existing Kern River water rights. We agree with KWBA.

Pursuant to section 15124 of the CEQA guidelines, the EIR project description must include (a) the precise location and boundaries of the proposed project, (b) a statement of the objectives sought by the proposed project, (c) a general description of the project's technical, economic, and environmental characteristics, and (d) a statement briefly describing the intended use of the EIR. (Cal. Code Regs., tit. 14, § 15124, subds. (a)-(d).)

The Project description included all of these elements. It set forth a *general* description of the Project's technical and environmental characteristics, including information about the process of obtaining a water right permit/license from the State Board, the methods and locations of water diversion, the water operations process, and monitoring of the groundwater. Nothing in the CEQA guidelines required KWBA to provide a specific quantification of the existing water rights within its Project description.

Moreover, the trial court erred in requiring a quantification of existing rights because, as KWBA notes, there has never been a stream-wide adjudication of Kern River water in which such rights have been quantified. A stream-wide adjudication is a complex proceeding conducted by the State

17

Board or court and could take several years or even decades to complete.  (§§ 2000 et seq., 2500 et seq.)  "CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive." (*Treasure Island*, *supra*, 227 Cal.App.4th at p. 1046.)  Here, the EIR disclosed all it reasonably could.  The Project Description met the requirements of CEQA.

*Environmental Settings Analysis*

"An EIR must include a description of the physical environmental conditions in the vicinity of the project.  This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant. . . .  The purpose of this requirement is to give the public and decision makers the most accurate and understandable picture practically possible of the project's likely near-term and long-term impacts."  (Cal. Code Regs., tit. 14, § 15125, subd. (a).)  The baseline condition must be based on actual existing physical conditions, as opposed to hypothetical conditions, under existing plans, permits or regulations.  (*Ibid.*)

"If the description of the environmental setting of the project site and surrounding area is inaccurate, incomplete or misleading, the EIR does not comply with CEQA.  [Citation.] 'Without accurate and complete information pertaining to the setting of the project and surrounding uses, it cannot be found that the FEIR adequately investigated and discussed the environmental impacts of the development project.'  [Citation.]" (*Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 87.)

Here, the trial court found that a detailed description of the environmental settings should include (1) "quantified measurements of water used by existing Kern River water rights

18

holders," *and* (2) "quantified measurements of the water those rights holders have the right to divert from the Kern River." With respect to the water used by existing rights holders, the court acknowledged that the WAA described "the means by which water is allocated to rights holders, outline[d] pre-1914 water right holders and diversions as outlined in the 1888 Miller-Haggin Agreement, . . . discuss[ed] approximate annual allocations to the first point, second point, lower river users, and Intertie deliveries from 1978 to 2011[,] . . . [and] summarize[d] flows at the second point, which reflect [Buena Vista]'s historic diversions and diversion to the Intertie." The court also acknowledged that KWBA "correctly state[d] that the setting and baseline discussion identifies and quantifies the amount of water that actually was diverted when water has been available for diversion." Nevertheless, the court found the EIR inadequate because "KWBA cannot cite to any quantification of existing water rights."

Here, a quantification of existing water rights was not necessary to an accurate and complete description of the environmental setting. Historical use may determine the quantitative limits on the amount of water that a pre-1914 water appropriator may divert. (*Millview County Water Dist. v. State Water Resources Control Bd.* (2014) 229 Cal.App.4th 879, 889.) As the lead agency, KWBA had the discretion to rely upon historical measurements of water to determine "'how the existing physical conditions without the project can most realistically be measured . . . . [Citation].'" (*Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 336-337.)

19

KWBA adequately discussed the environmental settings. It provided a detailed description of existing Kern River water allocations and provided historical measurements of water from the First Point, Second Point, and the Intertie during the baseline period. It also provided measurements of Kern River water that was historically diverted into the KWB. From these measurements, KWBA was able to show the availability of unappropriated water and provided estimates of how much water it could have diverted into the KWB under baseline conditions. A complete quantification of existing water rights was not necessary to provide these estimates. The EIR's environmental settings analysis complied with CEQA requirements.

*Environmental Impact Analysis*

KWBA contends the trial court erred when it found the EIR inadequately analyzed the environmental impacts on (1) existing water rights and (2) groundwater from long-term recovery operations. We again agree.

A lead agency shall prepare and certify the completion of an environmental impact report on a proposed project. (Pub. Resources Code, § 21100.) The report is required to have a "detailed statement" setting forth the "significant effects on the environment of the proposed project." (*Ibid*.; Cal. Code Regs., tit. 14, §§ 15126, 15126.2.) "In assessing the impact of a proposed project on the environment, the lead agency should normally limit its examination to changes in the existing physical conditions in the affected area as they exist at the time the notice of preparation is published, or where no notice of preparation is published, at the time environmental analysis is commenced. Direct and indirect significant effects of the project on the environment shall be clearly identified and described, giving due

20

consideration to both the short-term and long-term effects."  (Cal. Code Regs., tit. 14, § 15126.2.)

"When reviewing whether a discussion is sufficient to satisfy CEQA, a court must be satisfied that the EIR [] includes sufficient detail to enable those who did not participate in its preparation to understand and to consider meaningfully the issues the proposed project raises."  (*Sierra Club*, *supra*, 6 Cal.5th at p. 510.)

### 1.  Existing Water Rights

The Project seeks to use only unappropriated water which, by definition, excludes water being used pursuant to an existing right.  (§ 1202; Cal. Code Regs., tit. 23, § 695.)  Existing water rights would not be impacted because the Water Board cannot issue a new permit to divert water that is already subject to existing water rights.  (§§ 1201, 1202, 1375; Cal. Code Regs., tit. 23, § 695.)

Moreover, the State Board expressly allowed the processing of applications, such as Application 31676, in its Orders WR 2010-0010 and WR 2010-0016, after the State Board found that water diverted into the Intertie was unappropriated water.  The State Board determined that such water is "in excess of any proprietary water rights."

A quantification of existing rights was therefore not required.  Instead, the EIR properly used historical measurements of actual water diversions to evaluate the impacts on the water supply.  (See *ante*, at pp. 19-20.)  The analysis showed that water for the Project would be available "approximately 18% of the time."  It concluded that "[b]ecause KWBA would only divert available surplus Kern River water which cannot otherwise be used or stored by existing Kern River

21

water right holders, . . . [n]o mitigation is required because the project is not expected to result in a significant impact on available water supply."  This conclusion is supported by substantial evidence.  (*Sierra Club*, *supra*, 6 Cal.5th at p. 512.)

### 2.  Long Term Recovery Operations

The trial court found that the Project proposed to "alter recovery operations, since the Project proposes to make groundwater available for longer-term pumping operations for additional months or years during drought conditions.  As such, it is likely that the Project will result in groundwater depletion from extended recovery operations during a drought."

But the EIR explains that the purpose of the Project is to "add to groundwater supplies and increase the quantity" of water available for storage within the KWB.  The EIR analyzed the impacts of the Project against its baseline conditions and concluded that "[r]echarging this water would raise the local groundwater levels and result in a net increase in aquifer volume."

With respect to recovery operations, the EIR specifies that the Project "would not recover more groundwater than has been recharged."  The EIR states that "maximum recovery volumes during an extended 3-year drought, in any single year, or in any single month, are not expected to change substantially" because no new recovery facilities will be constructed.  During an extreme drought, the banking and storage of Kern River water "may result in extended periods of recovery (e.g., additional months or years), but, . . . *this would not exceed banked quantities*."  (Italics added.)

Moreover, the EIR explains that KWBA's preexisting operational commitments and monitoring programs[6] "would ensure that banking additional water . . . would not result in a deficit in aquifer volume or a lowering of the groundwater table levels that would result in potential adverse impacts to the production rate of pre-existing nearby wells or existing or approved land uses."

Buena Vista argues that the EIR erroneously relied on preexisting operations because an EIR cannot use mitigation measures to excuse a failure to analyze a project's impacts. This is incorrect. Preexisting operations are not mitigation measures designed to reduce a project's impact. Rather, they are a part of the ongoing baseline operations. (See *Citizens for Environmental Responsibility v. State ex rel. 14th Dist. Ag. Assn.* (2015) 242 Cal.App.4th 555, 570-571.)

The EIR thus complied with CEQA requirements in adequately assessing long-term recovery operations on groundwater levels. Substantial evidence supports the conclusion that there will not be a significant impact on groundwater levels because the Project will not increase long-term recovery beyond historical (baseline) operations. (*Sierra Club*, *supra*, 6 Cal.5th at p. 512.)

---

[6] These include the KWB Memorandum of Understanding Regarding Operation and Monitoring of the Kern Water Bank Groundwater Banking Program (KWB MOU), Long-Term Project Recovery Operations Plan Regarding Kern Water Bank Authority Project, Interim Project Recovery Operations Plan, and the Joint Project Recovery Operations Plan (Joint Plan). KWBA states that it will continue to adhere to the commitments set forth in these plans and agreements.

## DISPOSITION

The judgment is reversed.  Appellant shall recover costs on appeal.


TANGEMAN, J.


We concur:


YEGAN, Acting P. J.


PERREN, J.

Kevin G. DeNoce, Judge

Superior Court County of Ventura

_____

Downey Brand, Kevin M. O'Brien, Christian L. Marsh, David E. Cameron and Natalie C. Kirkish for Defendant and Appellant.

McMurtrey, Hartstock & Worth, Isaac L. St. Lawrence, James A. Worth and Jeremy S. McNutt for Plaintiff and Respondent.

Filed 3/22/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| BUENA VISTA WATER STORAGE DISTRICT,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KERN WATER BANK AUTHORITY,<br><br>    Defendant and Appellant. | 2d Civil No. B309764<br>(Super. Ct. No. 56-2019-00528316-CU-WM-VTA)<br>(Ventura County)<br><br>ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PUBLICATION<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on February 23, 2022, be modified as follows:

1. On page 1, the first paragraph is deleted and the following two paragraphs are inserted as the first two paragraphs of the opinion:

> For many years, the Kern River was designated a fully appropriated stream, and only those who held an appropriative right could divert Kern River water.  In 2010, the State Water Board (State Board) found that in

certain wet years, there was Kern River water in excess of that used by rights holders available for diversion. Kern Water Bank Authority (KWBA) filed an application with the State Board seeking a permit for a water right, and it prepared an environmental impact report (EIR) for a project to divert and store up to 500,000 acre-feet-per-year (AFY) of Kern River water in wet years. Buena Vista Water Storage District (Buena Vista) challenged the EIR, and the trial court ruled in Buena Vista's favor.

Here, we conclude that when a project is subject to changing conditions, such as annual rainfall and snowmelt, a project description must be sufficiently flexible to account for such changing conditions. We also conclude that in the absence of a preexisting stream-wide adjudication of water rights, an adequate discussion of the existing water rights need not include a definitive quantification of those rights. Because we conclude the EIR was adequate, we reverse the judgment of the trial court.

2. On page 3, first sentence of the third full paragraph, "(State Board)" is deleted.

3. On page 7, first sentence of the second full paragraph, "[acre-feet-per-year (AFY)]" is deleted from the quotation and replaced with "[AFY]" so that the sentence reads:

The Kern Water Bank Authority Conservation and Storage Project (the Project) was proposed by KWBA

27

and is designed "to directly divert up to 500,000 [AFY] from the Kern River for recharge, storage, and later recovery within the KWB through existing diversion works and recharge facilities located on the KWB lands, and/or to deliver water directly to KWBA's participating members' service areas via [existing canals]."[10]

4. On page 10, first sentence of the last continuing paragraph, "CEQA" is deleted and replaced with "California Environmental Quality Act (CEQA)" so that the sentence reads:

KWBA contends (1) the Project descriptions of Project water and existing water rights satisfied California Environmental Quality Act (CEQA) requirements; (2) a complete quantification of existing Kern River water rights was not required; and (3) the EIR properly evaluated the environmental impacts of long-term recovery operations on existing rights and groundwater levels.

---

[10] 500,000 AFY is the maximum quantity that KWBA can physically divert and recharge within the KWB in the wettest years. Any water directly diverted to KWBA members would reduce the amount that can be diverted to storage by the same amount.

The opinion in the above-entitled matter filed on February 23, 2022, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

There is no change in judgment.


_____

YEGAN, Acting P. J.     PERREN, J.     TANGEMAN, J.