Filed 6/9/23

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE CLAREMONT CANYON CONSERVANCY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>THE REGENTS of the UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Appellant. | A165012<br><br>(Alameda County Super. Ct. No. RG21091666) |
| HILLS CONSERVATION NETWORK,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CAROL T. CHRIST, as Chancellor, etc. et al.,<br><br>    Defendants and Appellants. | (Alameda County Super. Ct. No. RG21091977) |

To reduce wildfire risk on a large swath of hilly, forested, and fire-prone land on the University of California, Berkeley's (University) Hill Campus, The Regents of the University of California, Berkeley (Regents) prepared and approved a plan to conduct vegetation removal projects. In connection with this effort, the Regents prepared and certified an environmental impact report (EIR) describing the projects and analyzing

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion part II.

1

the plan's environmental impacts pursuant to the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.; undesignated statutory references are to this code) and its implementing regulations (Cal. Code Regs., tit. 14, § 15000 et seq. (Guidelines)).

Thereafter, two organizations — The Claremont Canyon Conservancy (Claremont) and Hills Conservation Network (Hills; collectively plaintiffs) — filed petitions for writ of mandate challenging the adequacy of the EIR's description of four vegetation removal projects and its discussion of certain environmental impacts. The trial court consolidated the petitions, and it agreed with plaintiffs about the project descriptions. It concluded the descriptions were "uncertain and ambiguous" because the EIR provided "vague conceptual criteria" but no concrete information on how the "criteria will be implemented." (The court did not address plaintiffs' challenges to the EIR's discussion of environmental impacts.) The court issued a peremptory writ of mandate directing the Regents to, among other things, vacate the EIR certification as to those projects.

The Regents appeal.[1] They contend the challenged vegetation removal project descriptions comply with CEQA, and the EIR contains

---

[1] Carol T. Crist, Chancellor of the University, has also appealed. We refer to Crist and the Regents collectively as the Regents. Numerous amici curiae support the Regents. They are: Marin Wildfire Prevention Authority, Marin County, Napa County, East Bay Regional Park District, East Bay Municipal Utility District, California Department of Forestry and Fire Protection (Cal Fire) and State Board of Forestry and Fire Protection. We have considered the briefs filed by amici curiae and plaintiffs' answer briefs. We deny Claremont's request for judicial notice of information and documents outside the voluminous administrative record. (See *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573 & fn. 4.)

2

sufficient information to analyze the projects' environmental impacts. We agree and reverse.

## BACKGROUND

We begin with an overview of the facts, and we provide more detail when discussing the parties' claims. The University's Hill Campus spans approximately 800 acres in the East Bay Hills. It borders private residences, the Lawrence Berkeley National Laboratory, and the Claremont Canyon Regional Preserve. The campus — much of which is heavily forested and located in a "Very High Fire Hazard Severity Zone" — has been plagued by wildfires, the first of which occurred in 1905. After the 1923 Berkeley fire, the University began fire management planning; since then, it has conducted periodic vegetation removal and maintenance to reduce wildfire risk. In 2019 — two years after the Grizzly fire burned nearly two dozen acres of the campus — the University received a Cal Fire grant to implement on-campus hazardous fire fuel reduction projects.

With the assistance of grant funding, the Regents retained an expert wildland fire manager/fire ecologist to develop and prepare a Wildland Vegetative Fuel Management Plan (plan). The plan proposes vegetation removal projects on 121 acres dominated by conifer and eucalyptus stands. Among the plan's objectives are "managing the amount and continuity of vegetation . . . that increases wildland fire hazards" and to substantially "reduce highly flammable invasive plant species and promote the growth of fire-resistant native plant species to reduce wildfire risks." The plan proposes several vegetation treatment projects which — as discussed in more detail *post* — include one fuel

3

break project and three fire hazard reduction projects.  The University's Fire Mitigation Committee reviewed the plan.

In late 2019, the Regents began the EIR preparation process and solicited input on the EIR's scope and content.  During the public scoping and review process, plaintiffs submitted extensive comments and provided alternate proposals.  In August 2020, the Regents circulated a draft EIR containing programmatic and project-level review.  Plaintiffs submitted additional comments on the draft EIR.  Then, in early 2021, the Regents released and certified a final EIR incorporating the comments.  The EIR attaches the plan.

Plaintiffs filed petitions for writ of mandate challenging the adequacy of four of the EIR's project descriptions and its discussion of certain environmental impacts.  (Notably, Hills contended the projects went too far, and Claremont thought they didn't go far enough.)  The trial court consolidated the cases and — over the Regents' opposition — granted the consolidated mandate petition.  It determined the challenged project descriptions were "not accurate, stable and finite" as required by CEQA.  According to the court, the EIR provided "only conceptual criteria which [are] proposed to be applied . . . .  There is no information provided in the Plan or the EIR from which the interested public might discern what will be the result of the proposed 'variable density thinning.'  The Plan leaves the decisions of exactly how to implement the vague conceptual criteria to achieve the goal of 'variable density thinning' in each of the specific projects to an arborist engaged to make the decisions at a later date."  The court also noted the "discretion left to the arborist is so broad that it is not predictable how the criteria will be implemented. [¶]  This conclusion that the description is inadequate is buttressed by the

4

fact that each of the petitioners is fearful that the arborist's discretion will result in either the Regents clear cutting trees . . . or that the Regents won't cut enough trees to provide meaningful hazardous fuel reduction."  The court also found the Regents were "presently able to evaluate each of the specific project areas and provide information detailing the actual impact of the application of the criteria" for each project.

The trial court concluded the "Regents' failure to present a concrete plan for any of the . . . specific [projects] by failing to identify more than the conceptual criteria that the Regents' employee would later apply renders the description uncertain and ambiguous.  It precludes informed decision making and public participation and is a prejudicial abuse of discretion."  The court did not address plaintiffs' challenges to the EIR's analysis of environmental impacts.  It issued a peremptory writ of mandate directing the Regents to set aside and vacate the approvals of the four challenged projects and the portions of the plan addressing those projects.

## DISCUSSION

We begin by describing the statutory scheme.  "As a general proposition, CEQA depends on the EIR.  An environmental impact report is an informational document, the purpose of which is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project. [Citation.]  . . . The purpose of an EIR is to give the public and government agencies the information needed to make informed decisions,

5

thus protecting not only the environment but also informed self-government." (*Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 724–725 (*Tiburon*), fn. & internal quotation marks omitted.)

" 'A public agency must prepare an EIR or cause an EIR to be prepared for any project that it proposes to carry out or approve that may have a significant effect on the environment. [Citations.] The EIR must describe the proposed project and its environmental setting, state the objectives sought to be achieved, identify and analyze the significant effects on the environment, state how those impacts can be mitigated or avoided, and identify alternatives to the project, among other requirements.' " (*Tiburon*, *supra*, 78 Cal.App.5th at p. 725.) As explained in the Guidelines — which " 'are binding upon all state and local agencies in applying CEQA' " — an EIR must include a project description containing the following information: " '(1) the precise location and boundaries of the proposed project; (2) a statement of the objectives sought by the proposed project, including the underlying purpose; (3) a general description of the project's technical, economic, and environmental characteristics; and (4) a statement briefly describing the intended uses of the EIR.' " (*Tiburon*, at pp. 724, fn. 16, 738, see Guidelines, § 15124, subds. (a)–(d).) "An EIR must contain an accurate, stable, and finite project description. [Citation.] Such a project description 'is the sine qua non of an informative and legally sufficient EIR.' " (*Save Our Capitol! v. Department of General Services* (2023) 87 Cal.App.5th 655, 673 (*Save Our Capitol!*); *Tiburon*, at p. 738.)

The project description "should not, however, supply extensive detail beyond that needed for evaluation and review of the environmental

6

impact." (*Tiburon, supra,* 78 Cal.App.5th at p. 738, internal quotation marks omitted; Guidelines, § 15124.) Rather, the " 'EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is . . . reviewed in the light of what is reasonably feasible. . . . [C]ourts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.' " (*Tiburon,* at p. 726; Guidelines, § 15151.)

"Much of what goes into an EIR is left to the discretion of the agency preparing it. . . . 'The lead agency has discretion to design the EIR and need not conduct every recommended test or perform all required research. [Citations.] An EIR is not required to address all of the variations of the issues presented. [Citation.] An analysis of every permutation of the data is not required.' " (*Tiburon, supra,* 78 Cal.App.5th at p. 726.) " 'Drafting an EIR . . . necessarily involves some degree of forecasting. While foreseeing the unforeseeable is not possible, an agency must use its best efforts to find out and disclose all that it reasonably can.' " (*Id.* at p. 727; Guidelines, § 15144.) Although an EIR must include "summarized technical data, maps, plot plans, diagrams, and similar relevant information sufficient to permit full assessment of significant environmental impacts by reviewing agencies and members of the public" (Guidelines, § 15147), the "degree of specificity required in an EIR will correspond to the degree of specificity involved in the underlying activity which is described in the EIR." (*Id.,* § 15146.) An "EIR cannot be faulted for not providing detail that, due to

7

the nature of the Project, simply does not now exist. [Citation.] Nor have the courts required resolution of all hypothetical details prior to approval of an EIR." (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1054 (*Treasure Island*).)

Having provided a statutory overview, we turn to the standard of review. An "EIR is presumed adequate," and the party challenging its adequacy "has the burden of proving otherwise" by establishing a "prejudicial abuse of discretion." (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 329 (*South of Market*), internal quotation marks omitted; *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463.) "A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process." (*South of Market*, at p. 331, internal quotation marks omitted.)

Whether an EIR includes sufficient "detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project' . . . presents a mixed question of law and fact. As such, it is generally subject to independent review. However, underlying factual determinations—including, for example, an agency's decision as to which methodologies to employ for analyzing an environmental effect—may warrant deference. Thus, to the extent a mixed question requires a determination whether statutory criteria were satisfied, de novo review is appropriate; but to the extent factual questions predominate, a more deferential standard is

8

warranted." (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 516, internal citations omitted.) In performing substantial evidence review, a court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable, for, on factual questions, our task is not to weigh conflicting evidence and determine who has the better argument." (*East Oakland Stadium Alliance v. City of Oakland* (2023) 89 Cal.App.5th 1226, 1239, internal quotation marks omitted.)

Finally, reviewing courts may not "interpret CEQA or the . . . Guidelines in a manner which imposes procedural or substantive requirements beyond those explicitly stated." (*Tiburon, supra*, 78 Cal.App.5th at p. 724, fn. 16, internal quotation marks omitted.)

I.

The Regents first contend the trial court erred by concluding four project descriptions were "not accurate, stable and finite" as required by CEQA. We agree.

To place the issues in context, we provide additional background on the challenged project descriptions. The plan proposes two types of projects — one fuel break project and three fire hazard reduction (FHR) projects. Reproduced below is a map showing the project locations:

9



To develop the plan and select the project locations, the University used fuel models to predict fire behavior on the Hill Campus. The modeling considered factors such as predicted flame length, rate of spread, crown fire activity, and maximum spotting distance, along with

the vegetation in a particular location — e.g., oak-bay woodland, eucalyptus forest, and coniferous forest. The EIR contains figures showing vegetation and fuel distribution in the project areas and the predicted crown fire activity under certain weather conditions.

The plan proposes creating fuel breaks to reduce the spread of fire between canyons on the Hill Campus. As described in the plan, fuel breaks — linear strips of land up to 200 feet wide on ridgelines where vegetation is treated or removed — are "shaded" or "non-shaded." To create a shaded fuel break, the University would remove understory vegetation and certain trees in the designated area. To create a nonshaded fuel break, the University would remove all tree and shrub vegetation in the designated area. The EIR provides photographic examples of shaded and nonshaded fuel breaks, and it identifies objective standards for vegetation removal. For example, in a shaded fuel break, trees that "easily torch (such as Monterey pine and eucalyptus) should have horizontal spacing of at least 35 feet." In a nonshaded fuel break, the standard would be that "shrubs should be no more than 2 feet in height, and some shrubs would be thinned to create groupings no larger than 120 square feet, separated by a minimum distance of 12 feet."

One proposed fuel break is located along Claremont Ridge (the East-West FB). The East-West FB is 1.4 miles long and 126 feet wide, covering approximately 22 acres. Because vegetation in the East-West FB "area is both forested and a mixture of brush and grass, the . . . fuel break will be a shaded fuel break in some segments and a non-shaded fuel break in other segments. In these locations, Monterey pines will be removed to prevent torching and ember production, and . . . distribution in the adjacent canyon." The EIR notes the East-West FB "would be

11

primarily . . . non-shaded . . . although some trees would remain."  In the nonshaded portions of the fuel break, "all trees and vegetation, including areas of eucalyptus trees" would be removed.  The EIR describes the vegetation removal methods in the East-West FB.

The plan also proposes FHR projects in Strawberry Canyon and Claremont Canyon, and on Frowning Ridge — areas "where eucalyptus trees were previously removed but regrowth occurred."  Collectively, these FHR project areas comprise 98.4 acres and consist primarily of conifer and eucalyptus forest.  The Strawberry Canyon FHR is approximately 24 acres — 21.25 of which is eucalyptus forest — broken up into six separate areas.  The Claremont Canyon FHR is approximately 26 acres — 23.62 of which is eucalyptus forest — spread over three distinct areas.  And the Frowning Ridge FHR is 49 acres — 28.12 acres of which is eucalyptus forest — broken up into at least six distinct areas.

The goal of the FHR projects is to reduce "hazardous fire conditions . . . to help promote landscape resiliency and improve native habitat."  In the FHR project areas, the focus would be on removing "high hazard vegetation" — i.e., vegetation with "physical attributes" in specific locations that contributes to wildfire risk.  The EIR identifies objective criteria for tree removal in the FHR project areas.  These "include consideration of tree health, structure, height, potential for failure, flammability/fire hazard, high fuel volume production of small diameter fuels, and competition with other trees (including for water, space, and

12

light).” Additional criteria include “vertical and horizontal spacing and [the vegetation’s] corresponding potential to torch and produce embers.”[2]

The plan proposes removing the following vegetation in the FHR project areas: (1) dead, unhealthy or structurally unsound trees; (2) trees that would torch or burn with high fire intensity; (3) shrubs within six feet of tree canopies; (4) shrubs or short trees growing under tall trees, to create a vertical separation of 2.5 times the height of the understory shrub or tree and the overstory tree canopy; (5) small diameter trees and branches that are lower than eight feet from the ground; and (6) lower limbs of trees near roads, trails, and buildings “would be pruned, understory vegetation shortened, and grass mowed.”

In addition to the above criteria, the University planned to employ “variable density thinning” — a principle used by arborists and professional foresters — which considers site-specific conditions and “the condition of adjacent vegetation.” As explained in the EIR, variable density thinning is intended to create “gaps in canopy cover and tree density” to “reduce canopy fire spread,” e.g., “fire movement from tree crown to tree crown.” Grouping of multiple trees with “torching potential because of their vertical connectedness will be thinned so that the canopies are separated vertically, with a preference for retention . . . for healthier trees that will allow for sustained growth.” No “clearcutting of

---

[2] The plan also identifies objective criteria for tree *retention*. The University would determine which trees to retain by considering “fuel characteristics (flammability, fuel volume, amount of dead material), . . . ability to slow spreading of invasive species and surface fuels, protection of understory, encouragement of nesting and improvement of flight patterns of raptors, erosion prevention, and cost of removal.” Additionally, the plan sets an “overall vegetation recruitment and retention goal for native plants” of 80 percent.

vegetation would occur" in the FHR project areas. Instead, certain vegetation — such as eucalyptus — would be "targeted [for] removal . . . pursuant to the principles of variable density thinning." Eucalyptus trees "most likely to torch and produce embers afar" would be removed or pruned.

The EIR describes the proposed implementation of variable density thinning in the FHR project areas. For example, "if two trees are adjacent and one is prone to torching, the tree that is prone to torching would be removed. Shrubs would be removed from under the tree that is to be retained" and "removed from under and within 6 feet of the tree canopy." Additionally, if "a particularly tall tree is to be retained, and a short tree is located under it, the short tree would be removed if its height is more than 2.5 times the distance between the first set of branches of the tall tree and the top of the shrub or short tree. Thus, if tree branches of a tall tree to be retained starts at 25 feet off the ground (as occurs in some stands of cypress, Monterey pine and some eucalyptus trees), trees taller than 10 feet would be removed. [¶] Shrubs would be removed from under and within 6 feet of the tree canopy. No shrubs will remain within 6-feet of a tree canopy." The EIR describes the vegetation removal mechanisms in the FHR project areas.

A certified arborist and registered professional forester would determine the "precise number of trees that may be removed" in the FHR project areas by applying principles of variable density thinning and the objective criteria listed in the plan. The EIR does not identify a "set tree density" or "specify the exact number of trees that would be removed" because — as the University explained — the removal of "trees that are unhealthy, structurally unsound, and prone to torching" will create

14

a "canopy of variable density." Additionally, it was "not feasible to specify the exact number of trees that would be removed" as "the numbers and locations of trees removed will require constant evaluation and consideration in the field," in part because some trees — such as eucalyptus, which are capable of "prolific reproduction" — grow, and others die. Moreover, the "dynamic nature" of the Hill Campus topography, together with changing weather conditions — such as freezes and droughts — necessitate a flexible approach to allow vegetation removal "treatments to adapt to changing conditions."

Plaintiffs submitted extensive comments in response to the draft EIR. For example, Claremont noted the University had neither conducted a "forest analysis" or vegetation survey, nor provided "before and after project completion numbers." And Hills criticized the EIR for failing to adequately describe the "extent of tree removal, i.e. eradication or selective thinning, . . . within the three [FHR] projects." Plaintiffs also offered alternatives to the plan — albeit conflicting ones. For example, Claremont proposed treating a larger area, removing all eucalyptus and some conifer, allowing native vegetation to repopulate, and establishing additional fuel breaks. Hills, by contrast, proposed retaining large eucalyptus and pine and prohibiting the removal of vegetation located more than 200 feet from a road or structure and the removal of trees with a diameter less than 18 inches. The final EIR addressed plaintiffs' comments and analyzed the alternative proposals.

Having set out the relevant background, we turn to the parties' arguments. As we have noted, a project description must include the precise location and boundaries of the proposed project on a detailed map; a general description of the proposed project's objectives, including the

15

project's underlying purpose; a general description of the project's technical, economic, and environmental characteristics; and a brief description of the EIR's intended uses. (Guidelines, § 15124, subds. (a)–(d).) The EIR contains this information. It identifies the precise locations and boundaries of the East-West FB and FHR projects on a detailed map. The EIR also describes the underlying purpose of the projects — to reduce the amount and continuity of vegetation that increases wildland fire hazards, including highly flammable invasive plant species — and it explains why vegetation removal is required in the project areas. Next, the EIR contains a description of the vegetation in each project area, lists objective vegetation removal criteria, and summarizes the methods used to remove vegetation. Finally, the EIR summarizes the purpose of the projects and the EIR's intended use. Thus, the EIR provides sufficient information to understand the projects' environmental impacts.

Hills disagrees, contending the description of the East-West FB is unstable because the project description indicates "some trees would remain" in the fuel break, whereas the discussion of visual impacts states "all . . . vegetation" would be removed. According to Hills, the EIR's failure to assign meaning to the phrase "some trees" renders the project description unstable. We are unpersuaded. The EIR is not, as Hills seems to suggest, required to specify which trees "would remain." The EIR identifies the objective of the East-West FB — to reduce the spread of fire between canyons on the Hill Campus — and it explains that to accomplish that objective, the University proposed removing vegetation along a linear strip of land 1.4 miles in length on the Claremont Ridge. The EIR identifies the type of trees that would be removed in the nonshaded portions of the East-West FB and it proposes an objective

16

spacing standard for trees that would remain in shaded portions of the fuel break and at the outer edges of the treatment area. The EIR also provides a map showing the project location and visual examples of shaded and nonshaded fuel breaks. This information is sufficient to enable decision-makers and the public to understand the project's environmental consequences. (*Save Our Capitol!, supra,* 87 Cal.App.5th at p. 687; *Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 36.)

Next, Claremont faults the Regents for failing to specify the number of trees that will be removed in the FHR project areas.[3] Claremont contends that without this information, it is unable to evaluate and review the projects' environmental impacts. We disagree. As detailed above, the Guidelines caution that a project description "should not supply extensive detail beyond that needed for evaluation and review of the environmental impact" (Guidelines, § 15124) and the "degree of specificity required in an EIR will correspond to the degree of specificity involved in the underlying activity." (*Id.*, § 15146; see also *California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 269–270.) And as we have observed, courts "should not interpret CEQA to impose procedural or substantive requirements beyond those explicitly required in the statutes or CEQA Guidelines."

_____

[3] Notably, Claremont concedes the majority of the tree removal criteria listed in the EIR "specify objective standards." Instead, Claremont maintains the EIR must provide information on "how many [trees] will be removed . . . , how many will remain, and how they will be arranged." For its part, Hills claims a tree inventory is not required, but then insists the EIR must describe "what level of tree removal will result from applying the . . . criteria" and suggests a "thorough inventory" could — and should — have been prepared.

17

(*Dry Creek Citizens Coalition v. County of Tulare*, *supra*, 70 Cal.App.4th at p. 36.) Nothing in the Guidelines requires the EIR to include a tree inventory in the description of the East-West FB or FHR projects. (*Save Our Capitol!*, *supra*, 87 Cal.App.5th at pp. 686–688 [rejecting argument that EIR violated "CEQA by not including an inventory of plants and trees within the project boundaries"]; *Buena Vista Water Storage Dist. v. Kern Water Bank Authority* (2022) 76 Cal.App.5th 576, 591 (*Buena Vista*) [Guidelines do not require "specific quantification of the existing water rights"]; *Dry Creek*, at p. 36 ["CEQA does not mandate the detail appellants urge this court to require"].)

When, as here, a project is subject to variable future conditions — for example, unusual rainy weather, tree growth, impact of pests and diseases, changing natural resources, etc. — the "project description must be sufficiently flexible to account for [those] conditions." (*Buena Vista*, *supra*, 76 Cal.App.5th at p. 580.) Hills insists the conditions within the project areas "will not change in any substantive or unforeseen way" during EIR preparation or project completion. This argument is unavailing, as substantial evidence supports the Regents' conclusion that the challenged projects are subject to changing weather and topography conditions. So long as the EIR provides sufficient information to analyze environmental impacts — including the objective criteria being used — a project description for large-scale vegetation removal that is subject to changing future conditions need not specify, on a highly detailed level, the number of trees removed.[4] (See *In re Bay-Delta etc.* (2008) 43 Cal.4th

_____

[4] Our holding is not intended to foreclose the possibility that, in certain situations, disclosing the number and type of affected trees might be necessary or appropriate. (See, e.g., *Save Our Capitol!*, *supra*, 87 Cal.App.5th at pp. 686–687.)

18

1143, 1172–1173; *Buena Vista*, at p. 590 [rejecting contention that project description setting an " 'open-ended limit' " of water was unstable and indefinite; noting a "precise amount of water" could not "be determined because water availability will fluctuate from year to year"].)

*Treasure Island, supra*, 227 Cal.App.4th 1036, is instructive. That case concerned a multi-decade plan to convert a former naval station into a new, mixed-use community with, among other things, thousands of residential units and hundreds of thousands of feet of retail and commercial space. (*Id.* at pp. 1043–1044.) The project description included " 'fixed' elements, such as street layouts, and 'conceptual elements,' such as 'shapes of new buildings or specific landscape designs,' " but it did not describe the details of every element of the project, in part because the site required extensive remediation before the project could be developed. (*Id.* at pp. 1053, 1060–1061.)

A citizen group challenged the EIR certification, arguing the project description was "unstable and erratic," and characterizing the development plan as "nothing more than a 'conceptual land use map.' " (*Treasure Island, supra*, 227 Cal.App.4th at p. 1052.) The EIR, they claimed, lacked "the accurate, finite and stable project-level details necessary to fully analyze potentially significant impacts" and left "the specific configuration and design of particular buildings . . . for future review." (*Id.* at pp. 1052–1053, internal quotation marks omitted.) A division of this court disagreed. (*Id.* at pp. 1053–1055.) *Treasure Island* acknowledged the EIR did not describe every project detail, but it concluded "the basic characteristics of the Project . . . remained accurate, stable, and finite" (*id.* at p. 1055) and that "the EIR made an extensive effort to provide meaningful information about the project, while

19

providing for flexibility needed to respond to changing conditions and unforeseen events that could possibly impact the Project's final design." (*Id*. at p. 1053.)  As the court observed, the EIR included "maps showing the project location, the existing character of the site, project features, site plans, project objectives, . . . in short, all of the information required by CEQA." (*Id*. at p. 1055.)  It also noted the EIR acknowledged a duty to perform supplemental review pursuant to section 21166 "as the Project builds out over 15 to 20 years." (*Treasure Island*, at p. 1051.)

Although *Treasure Island* concerned a development project where supplemental environmental review was anticipated, its reasoning nonetheless applies.  Here, the EIR does not identify each tree that will be removed, but the projects' basic characteristics are "accurate, stable, and finite," and the EIR contains concrete criteria an arborist and a registered professional forester will use to determine which vegetation should be removed in the challenged project areas.  (*Treasure Island*, *supra*, 227 Cal.App.4th at p. 1055.)  As in *Treasure Island*, the Regents endeavored "to provide meaningful information" about the projects "while providing for flexibility needed to respond to changing conditions" that may affect the precise number of trees that will be removed in the project areas.  (*Id*. at p. 1053.)  Under *Treasure Island*, the absence of a tree inventory in the FHR project descriptions does not violate CEQA.

Hills maintains *Treasure Island*'s holding is inapplicable because the project details in that case were theoretical, whereas the tree removal details here are definite.  According to Hills, an "arborist merely had to walk the FHRs and other project areas, apply the tree removal criteria, and inventory and map the trees and canopy that would be removed." Hills seems to take the position that it was feasible for the Regents to

prepare a tree inventory, and that the EIR is deficient for omitting it. As we have stated, courts evaluate the sufficiency of an EIR in " 'light of what is reasonably feasible.' " (*Tiburon, supra*, 78 Cal.App.5th at p. 726; Guidelines, § 15151.) The Guidelines define " '[f]easible' " as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." (Guidelines, § 15364.)

We are not persuaded by Hills's argument. As an initial matter, the steep, rugged terrain of the FHR project areas — which span 98.4 acres over more than a dozen distinct areas — created a practical impediment to conducting a tree-by-tree inventory in connection with EIR preparation. In addition, the record contains evidence suggesting preparation of a tree inventory would be costly. Moreover, the Regents determined it was impractical to identify a "set tree density" and infeasible "to specify the exact number of trees that would be removed" as natural conditions could change significantly between the preparation of the EIR and the implementation of the projects. These factual determinations are entitled to deference. (See *East Oakland Stadium Alliance v. City of Oakland, supra*, 89 Cal.App.5th at p. 1239.) Together, this evidence amply supports the Regents' conclusion that it was not reasonably feasible to prepare a tree inventory in connection with the EIR.[5]

---

[5] We question Hills's assertion that surveying every tree associated with the projects and creating a map of each tree slated for removal would cost a mere $30,000, as well as its claim that the Cal Fire grant included funds to complete a tree inventory as part of the EIR preparation process. But even if we were to find this evidence persuasive, it would not compel a different outcome, as there is substantial evidence

21

To support their contention that the project descriptions are unclear and unstable, plaintiffs rely on *Washoe Meadows Community v. Department of Parks & Recreation* (2017) 17 Cal.App.5th 277 and *Stopthemillenniumhollywood.com v. City of Los Angeles* (2019) 39 Cal.App.5th 1. In *Washoe Meadows*, the draft environmental report presented five alternative projects — each with a different footprint and environmental impact — without identifying a preferred alternative. (*Washoe Meadows*, at pp. 281–284, 289.) Our colleagues held the draft EIR's "failure to identify or select any project at all . . . impair[ed] the public's right and ability to participate in the environmental review process." (*Id*. at p. 288.) *Stopthemillenniumhollywood.com* reached a similar conclusion. There, the draft EIR presented three "different conceptual scenarios" for a mixed-use development project without describing "the siting, size, mass, or appearance of any building proposed to be built at the project site." (*Stopthemillenniumhollywood.com*, at p. 18.) The court held the "concepts and development scenarios—none of which may ultimately be constructed—do not meet the requirement of a stable or finite proposed project." (*Ibid*.) This case bears no resemblance to the two relied upon by plaintiffs. Here, the EIR identifies discrete vegetation removal projects, and it provides concrete details about the projects and objective criteria for vegetation removal.

We reject Claremont's cursory assertion — lacking in evidentiary support — that the project description prevented meaningful comparisons between the plan and project alternatives. The record demonstrates the

in the record that preparing a tree inventory was not reasonably feasible. (See *Save North Petaluma River & Wetlands v. City of Petaluma* (2022) 86 Cal.App.5th 207, 216 [defining substantial evidence].)

EIR sufficiently identifies and analyzes alternatives to the project. (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 545–548.)

Finally, we reiterate that in reviewing an EIR, "technical perfection," "scientific certainty," and "exhaustive analysis" are not required. (*League to Save Lake Tahoe v. County of Placer* (2022) 75 Cal.App.5th 63, 95, internal quotation marks omitted.) Rather, the touchstone is "adequacy, completeness and a good-faith effort at full disclosure." (*Ibid.*, internal quotation marks omitted.) That standard was satisfied here. Viewed as an informational document, the EIR includes sufficient detail to enable the public to understand the environmental impacts associated with the Regents' plan to remove vegetation in specific locations on the Hill Campus to reduce wildfire risk.[6]

II.

Next, we accept the Regents' invitation to evaluate plaintiffs' remaining challenges to the EIR.

In its writ petition, Claremont asserted the EIR used outdated and invalid wind speed modeling, and that it failed to assess climate change impacts. For its part, Hills challenged the EIR's evaluation of visual, fire risk, and biological impacts. The trial court did not consider these arguments. At the parties' urging — and to promote judicial economy — we address these challenges in the first instance. (§ 21005, subd. (c); *Friends of the Santa Clara River v. Castaic Lake Water Agency* (2002)

---

[6] We decline to evaluate the sufficiency of the project descriptions by consulting case law assessing timber harvest plans under the Z'Berg–Nejedly Forest Practice Act of 1973 and corresponding regulations. (See, e.g., *Ebbetts Pass Forest Watch v. California Dept. of Forestry & Fire Protection* (2008) 43 Cal.4th 936, 940.)

23

95 Cal.App.4th 1373, 1387–1388.) As we have stated, an "EIR is presumed legally adequate . . . and the agency's certification of an EIR as complying with the requirements of CEQA is presumed correct." (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 924–925.) As the parties challenging the EIR's adequacy, plaintiffs "bear the burden of proving it is legally inadequate, or that insufficient evidence supports one or more of its conclusions." (*Ibid*.)

We begin with Claremont's arguments. It first contends the EIR uses "outdated and invalid" modeling to calculate the speed of so-called Diablo winds. Claremont appears to take issue with the University's decision to use "FlamMap 6.0" — a fire behavior prediction model — to calculate wildfire hazards in the project areas. Claremont also seems to suggest the University should have used a higher maximum wind velocity when modeling fire behavior. But Claremont acknowledges "an agency has discretion in selecting the methodology to be used in evaluating environmental impact, subject to review for substantial evidence." (*South of Market*, *supra*, 33 Cal.App.5th at p. 337.) We reject Claremont's argument for this reason alone. Moreover, Claremont's cursory briefing on this issue — which neglects to discuss all record evidence or cite relevant authority — fails to demonstrate the University's "choice of methodologies was unsupported by substantial evidence." (*Ibid.*; *Save Cuyama Valley v. County of Santa Barbara* (2013) 213 Cal.App.4th 1059, 1069 [substantiality of evidence supporting impacts analysis was not "undermined by the differing expert opinions"]; *Latinos Unidos de Napa v. City of Napa* (2013) 221 Cal.App.4th 192, 206 [failure to set forth all material evidence " 'is deemed a concession that the evidence supports the findings' "].)

24

Claremont next complains the EIR doesn't "discuss how implementing the Plan might worsen the effects of future climate change" on the project areas. This argument need not detain us long, as Claremont concedes the EIR acknowledges the climate may change in the project areas; examines whether implementation of the plan will increase greenhouse gas emissions; and discusses whether climate change will increase wildfire risk on the Hill Campus. (See *County of Butte v. Department of Water Resources* (2023) 90 Cal.App.5th 147, 160–162 [rejecting challenge to adequacy of public agency's discussion of climate change].)[7]

We turn to Hills's arguments, which fare no better. For example, Hills insists the EIR's discussion of visual impacts is insufficient because it does not "disclose the extent of tree and canopy removal." In a related vein, Hills asserts the EIR's discussion of fire risk impacts is lacking because it "does not engage on whether the removal of large trees will exacerbate fire risk." Finally, Hills asserts the EIR's discussion of impacts on the Alameda whipsnake is inadequate because it fails to detail "where the existing eucalyptus canopy will be retained." To the extent these arguments are a rehash of Hills's critique of the project

---

[7] Citing *California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 387, the Regents insist they had no obligation to analyze the impact of climate change on the projects. True, CEQA's "relevant provisions are best read to focus almost entirely on how projects affect the environment," and not the other way around. (*California Building Industry*, at p. 387.) Here, Claremont does not contend the EIR was required to evaluate climate change's effects on the projects; instead, Claremont argues the EIR needed to consider the projects' "effects on the environment under future climate change conditions." (*County of Butte v. Department of Water Resources, supra,* 90 Cal.App.5th at p. 162, fn. 2.)

descriptions, we reject them for the reasons discussed *ante*. In any event, Hills's conclusory claims, unsupported by pertinent authority, do not establish the EIR's discussion of these impacts is deficient. (See *Save Our Capitol!*, *supra*, 87 Cal.App.5th at p. 684; *South County Citizens for Smart Growth v. County of Nevada* (2013) 221 Cal.App.4th 316, 331.)

## DISPOSITION

The judgment is reversed. The trial court is directed to enter a new judgment denying plaintiffs' consolidated petition for peremptory writ of mandate. The Regents are entitled to costs on appeal. (Cal. Rules of Court, rule 8.278.)

_____

Rodríguez, J.

WE CONCUR:

_____

Tucher, P. J.

_____

Petrou, J.

A165012

Alameda County Superior Court, Hon. Frank Roesch.

Alison L. Krumbein; Monchamp Meldrum, Amanda Monchamp and Joanna Meldrum for Defendants and Appellants.

Rob Bonta, Attorney General, Robert W. Byrne, Assistant Attorney General, Annadel A. Almendras, Eric M. Katz and Janelle M. Smith, Deputy Attorneys General, for California Department of Forestry and Fire Protection and State Board of Forestry and Fire Protection as Amici Curiae on behalf of Defendants and Appellants.

Remy Moose Manley, Sabrina V. Teller, Veronika S. Morrison; Brian E. Washington, County Counsel (Marin); Thomas C. Zeleny and Jason M. Dooley, County Counsel (Napa); Lynne S. Bourgault, Rachel J. Sater; Derek McDonald, Karen Donovan and Tim Kline for Marin Wildfire Prevention Authority, East Bay Regional Park District and East Bay Municipal Utility District as Amici Curiae on behalf of Defendants and Appellants.

Lozeau Drury, Michael R. Lozeau and Brian B. Flynn for Plaintiff and Respondent Hills Conservation Network.

Law Offices of Stuart M. Flashman, Stuart M. Flashman; Law Offices of Michael Graf and Michael Graf for Plaintiff and Respondent Claremont Canyon Conservancy.